In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-2568

RICKY W. BEAUCHAMP and BETH E. BEAUCHAMP,

*Plaintiffs-Appellants*,

*v.*

CITY OF NOBLESVILLE, INDIANA, CYNTHIA DUKETTE,
JOE COOK, Hamilton County Sheriff, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 00-0393-C-M/S—**Larry J. McKinney**, *Chief Judge*.

ARGUED DECEMBER 2, 2002—DECIDED FEBRUARY 26, 2003

Before BAUER, POSNER, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Ricky Beauchamp was twice
arrested in 1998, once for attempted home invasion and
once for rape, pursuant to warrants issued largely on the
basis of his identification by a complainant, the putative
victim. He was charged with both crimes and jailed, but
prosecutors ultimately dismissed the charges after the
complainant's credibility came into question. Believing
that the police had unjustifiably credited the complain-
ant, ignored his own protestations of innocence, and sub-
mitted false or misleading information to the courts in

support of the warrants, Beauchamp brought this civil rights action under 42 U.S.C. § 1983 against two police detectives who caused his arrests, as well as a host of other defendants. Additionally, both Beauchamp and his wife Beth claimed, among other things, that the defendants committed the torts of false arrest, defamation, and outrage (also known as intentional infliction of emotional distress) under state law. The district court granted summary judgment in favor of all of the defendants. The Beauchamps appeal, and we affirm.

## I.

Ricky Beauchamp operated a window cleaning business in and around Indianapolis, Indiana. In February 1998, in preparation for a forthcoming vacation in sunnier climes, Beauchamp made a deal with the owner of the Blue Hawaiian Tanning Salon in the suburb of Fishers to clean the salon's windows in exchange for tanning sessions. There, Beauchamp met employee Michelle Klingerman, who on the side operated a small business cleaning newly built homes. Klingerman offered Beauchamp work cleaning construction debris from windows at one of her job sites. Beauchamp accepted, but their arrangement failed almost immediately because, Klingerman claimed, at the job site Beauchamp made offensive comments and sexual advances toward her. Although he admitted putting his arm around Klingerman and making comments that could be interpreted as sexual innuendo, Beauchamp denied making sexual advances and insisted that his comments were merely jokes. Soon after, Klingerman quit her job at the salon, and on February 22 lodged a complaint with the Fishers Police Department alleging that Beauchamp was harassing her sexually and that she had been "forced" to quit her job due to the harassment and the "uneasy feeling" Beauchamp gave her.

The morning after she filed her complaint with the police, Klingerman called 911 to report that a man was attempting to force his way into her home by "pounding on the door and yelling her name." Detective Cary Milligan of the Hamilton County Sheriff's Department responded to the call. When he arrived, Klingerman reported that the man had yelled "Michelle, are you in there? Michelle?", and that she had observed him running away. Although Klingerman did not see the man's face, she saw enough to describe him as a white male with a beard and a "pot belly," wearing a blue or black baseball cap, a hooded grey sweatshirt, and blue jeans. Milligan and other officers on the scene observed what appeared to be fresh scratch or pry marks on Klingerman's door frame. Klingerman claimed she had never seen the marks before. Milligan then asked Klingerman whether she had any problems with anyone lately. She replied that "a guy named Rick" had recently made unwanted sexual advances towards her at work, and further stated that she thought "Rick" was the man at her door because she recognized his voice and build.

Milligan learned Beauchamp's identify and that afternoon visited him at his home in Indianapolis, about 20 minutes away from Klingerman's. Beauchamp appeared almost exactly as Klingerman had described him, in a grey hooded sweatshirt and blue jeans, and with a beard and a "pot belly." Beauchamp was cooperative and agreed to accompany Milligan to the county jail to make a statement and record a sample of his voice. Once there, Milligan photographed Beauchamp and asked him about his whereabouts earlier that morning. Beauchamp told him that he woke up around 11:20 a.m. and left home around 12:30 p.m. to clean windows at a car dealership, where he stayed until 2:45 p.m. Beauchamp claimed that Milligan then asked him "Why don't you just tell us why you were out there [at Klingerman's]? I know you were the one that

was out there." Later that day, Milligan played the recording of Beauchamp's voice to Klingerman as part of a "line up" with the voices of five other white men speaking the same words. Klingerman identified Beauchamp's voice as the that of the man at her door.

The next morning Beauchamp left a voice mail message for Milligan explaining that he could verify his whereabouts the previous morning with telephone company records showing that he was logged onto the internet from home when Klingerman called 911, and that his wife Beth worked for the phone company and could corroborate his alibi. Milligan returned to Beauchamp's home that afternoon, and Beauchamp invited him to inspect his computer. Milligan declined to enter the house, although with Beauchamp's consent he searched Beauchamp's truck and toolbox, where he discovered a pocketknife that he suspected was used to make the marks on Klingerman's door. Later the police determined that, due to the shape of the marks, Beauchamp's pocket knife could not be conclusively linked to the incident. Additionally, Beauchamp claimed that Milligan warned him that "as soon as Michelle picks you out of the photo lineup, I'm having you arrested for [breaking and entering]."

In early March, an employee of a hair salon in the same shopping center as the Blue Hawaiian reported to Milligan that Beauchamp, who had been hired to clean the salon's windows, had sexually assaulted her on February 12. The employee, Danelle Ooley, explained that she delayed reporting the incident out of embarrassment. On March 5, Milligan submitted an affidavit of probable cause to the Hamilton County Superior Court repeating Klingerman and Ooley's allegations, and the court issued a warrant for Beauchamp's arrest for attempted "residential entry" (breaking and entering) and sexual battery. Conceding only that probable cause existed for the warrant on

the sexual battery charge, Beauchamp surrendered a few days later but was released on bond after spending a weekend in jail. As a condition of his release, the court commanded Beauchamp to stay away from Klingerman and Ooley.

On March 29, Klingerman returned home from a week-long vacation to discover that someone had carved "YOU DIE BITCH" on her front door. Beauchamp was traveling to South Carolina with his family that day, but had left Indiana only the day before. The Hamilton County prosecutor believed that Beauchamp was responsible for the vandalism and immediately sought to revoke his bond. The day before the revocation hearing Beauchamp received a threatening telephone call warning him to stay away from Klingerman or else he would "get a pipe upside the head." He reported the threat to the Marion County Sheriff's Department, and asked the phone company to monitor his phone for incoming calls. After Beauchamp testified at his revocation hearing that he was out of town from March 28 to April 5 and that he did not go near Klingerman's home, the court declined to revoke his bond. Immediately afterward, Beauchamp's attorney advised him to protect himself by keeping a log of his activities organized by date, time, and the mileage reading on his truck's odometer.

At 2:45 p.m. on April 15, Klingerman called 911 to report that she had just been physically assaulted in her home. Milligan and police from the City of Noblesville (where Klingerman's home was located) responded. Klingerman told Milligan that as she emerged from her bathroom after showering, someone grabbed her from behind, threw her to the floor, jumped on, hit, and scratched her, and menacingly warned her "Bitch, you are going to get it for what you did." Although her attacker wore a black ski mask, Klingerman suspected it was Beauchamp because she recognized her assailant's eyes through the

mask, and recognized his mannerisms, and voice. After speaking to the police, Klingerman was treated at a hospital for her injuries. Detective Cynthia Dukette of the Noblesville Police Department was assigned to investigate the case. Milligan and Dukette later interviewed Klingerman together, and Klingerman repeated the same details she had reported to Milligan earlier.

That night, Beauchamp called the police after receiving seventeen threatening telephone calls accusing him of stalking and raping Klingerman. Marion County Sheriff's Deputy Kelly Weidner investigated. Weidner, accompanied by Dukette, visited Beauchamp at his home. Beauchamp had never seen Dukette before and was unaware that Dukette was actually investigating Klingerman's assault. Weidner introduced her to Beauchamp as "Detective Matchett," but did not mention that "Matchett" was investigating Klingerman's assault.[1] Beauchamp played recordings of the threatening calls, and Weidner and Dukette both heard the caller accuse him of raping Klingerman. Beauchamp believed that the caller was an acquaintance of Klingerman's named Jeffrey Leveridge. Beauchamp also allowed Weidner and Dukette to photocopy his log. The phone company later confirmed that Leveridge was indeed the source of the threats, and the threats ceased after Milligan threatened Leveridge with prosecution. Meanwhile, Dukette attempted to verify Beauchamp's whereabouts on the day of the attack on Klingerman by investigating his log entries. On the day of the incident, Beauchamp had noted a visit to a business called Team

---

[1] Several years before these events, Weidner and Dukette had worked together as Noblesville police officers and at the time Weidner knew Dukette as "Cynthia Matchett." Dukette's legal surname is Dukette-Matchett, according to an affidavit she submitted to the district court. The parties call her "Dukette," however, and we will continue to do the same.

Scandia. Team Scandia's receptionist confirmed that Beauchamp had been there around 12:30 p.m. and had stayed for 15 minutes. The receptionist recalled that Beauchamp was wearing a navy blue, black, and red plaid flannel shirt, and gave a physical description of him substantially matching Klingerman's from the day of the assault.

On April 24, Klingerman took a polygraph exam arranged by Milligan and Dukette. The examiner concluded that Klingerman was telling the truth when she stated that "someone unknown to her" had attacked her in her home, but that Klingerman was also telling the truth when she declared that she knew who had attacked her. The examiner concluded that Klingerman was being "deceptive," however, when she asserted that she had "report[ed] the truth to the police concerning the attack." When Milligan queried her about her answers after the exam, Klingerman became distraught and revealed that she was not just assaulted but also raped, and that she had been bleeding vaginally ever since. Klingerman claimed she was not forthcoming about being raped because she was afraid that her husband would stop loving her. She further told Milligan that she felt confident that it was Beauchamp who had raped her, and that she had noticed that her rapist was wearing a wedding band and a blue plaid shirt.

Based on Klingerman's allegations and identification of Beauchamp, Detective Milligan asked the Hamilton County prosecutor to charge Beauchamp with rape, and a hearing was convened to determine whether arrest and search warrants should issue. At the hearing, Milligan, the only witness, testified that Klingerman identified Beauchamp as the person who raped her based on his eyes, voice, and mannerisms. When asked about the results of the polygraph, Milligan told the court that the results showed that Klingerman generally was truthful about the attack, but that she had difficulty when asked whether she had

been completely honest with the police. Milligan explained that when he confronted Klingerman, she became extremely distraught and admitted that she actually had been raped, not just assaulted. Milligan also explained, in contrast to what Klingerman had said after the polygraph, that she was not forthcoming about the rape because she was afraid her husband would kill Beauchamp. Based on this testimony, the court found probable cause to believe that Beauchamp had raped Klingerman, and issued warrants for his arrest and to search his home for evidence.

The police executed the warrants around 11:30 p.m. that night. Beauchamp was sleeping when they arrived, although his wife Beth was working at her computer and her daughters were watching television with a friend. Beth heard her dogs barking and looked out the window where she saw several unmarked cars. Beth, who had been frightened by the telephone threats, became concerned because it was not readily apparent to her that the cars belonged to the police. Nevertheless, she opened the door and encountered Detectives Milligan and Dukette, and several Marion County deputies. Beth claimed that she demanded to see a warrant, but the officers ignored her, and one pushed her aside and ran into the house with pistol drawn looking for her husband. She also claimed that the police pulled her down the stairs "in retaliation" for demanding a warrant. Beth recalled the scene was chaotic "like a war zone," and claimed that the officers pushed her from room to room and intimidated her. At one point Dukette attempted to question Beth's daughters (they are from a previous marriage). Beth demanded that she stop, but Dukette ignored her. Milligan then asked Beth some questions. She declined to answer, and later claimed that in response Milligan called her a "bitch."

A few days later, an article appeared in the Noblesville *Daily Ledger* reporting Beauchamp's arrest. The article stated that Beauchamp had attacked a local woman in her home, attributing the information to Curtis Kinman, a spokesperson for the Noblesville police. The article further reported that the police believed that Beauchamp "may be involved in other crimes," and that the police "desperately" needed assistance from the public. Kinman later claimed he did not recall speaking with the *Daily Ledger* about Beauchamp, and that he did not know where the newspaper got its information. He opined, however, that the reporter may have gleaned the information in the article from court filings, and added that he believed the information was of public concern. Dukette also claimed to not recall speaking about Beauchamp with either the *Daily Ledger* or Kinman. She conceded, however, that if Kinman had asked her about Beauchamp she would have given him the information.

On May 4, the state moved to revoke Beauchamp's bond. Klingerman testified at the hearing, and repeated her description of the incident and her belief that Beauchamp had raped her. She asserted that she was positive that it was Beauchamp because, although she did not see his face because of the ski mask, she knew her rapist was white, and recognized Beauchamp's eyes, voice, and build. Photographs of Klingerman taken shortly after the incident showing marks on her throat and scratches on her chest and breasts were introduced into evidence. On cross-examination by Beauchamp's attorney, Klingerman testified that she had failed to lock the deadbolt on her front door on the day of the incident. She also declared that she had observed Beauchamp following her on at least three occasions, once being the day of the incident. Next, Milligan took the stand and testified that he was able to easily gain access to Klingerman's home by jimmying her lock with a credit card. He also stated

that Klingerman was extremely distraught after the attack, but resolute in her belief that Beauchamp had assaulted and raped her. Beauchamp presented no witnesses, and the court revoked his bond. He remained in custody until July 28, when additional polygraph examinations of Beauchamp and Klingerman caused the prosecutor to doubt Klingerman. The polygraph examiner had concluded that Beauchamp was answering "truthfully" when he denied having sexual intercourse with Klingerman, whereas he concluded that Klingerman gave "inconclusive" answers when questioned whether Beauchamp had engaged in intercourse with her and whether she was being honest.

Although Beauchamp had been released from custody, the order commanding him to stay away from Klingerman remained in effect. By this time Klingerman was working in a chiropractic office in Fishers. On August 12, Klingerman called the police from work to report receiving a harassing phone call from Beauchamp. She also claimed that she recently observed Beauchamp near her office. Dukette and other officers with the Fishers Police Department determined that the call may have originated from within Klingerman's office. Nevertheless, the police forwarded Klingerman's complaint to the Hamilton County prosecutor, who advised them to prepare probable cause affidavits and await further instructions. About a week later, Klingerman's employer reported to the police that someone had left a threatening message for Klingerman on the office voice mail system. The caller apparently had attempted to disguise his or her voice by speaking in a raspy whisper, but Klingerman's employer was convinced that the caller sounded like Klingerman herself. After listening to the message, the police concluded only that the caller sounded like a woman or a child.

Following these events, the prosecutor dismissed the rape charges, and shortly afterward agreed to dismiss the attempted residential entry charge in exchange for Beauchamp completing a six-month term of supervision. Beauchamp and his wife then filed this lawsuit in federal court naming Detectives Milligan and Dukette, Officer Weidner, the Sheriffs of Hamilton and Marion Counties, and the City of Noblesville as defendants. Beauchamp claimed, among other things, that the defendants wrongfully brought and maintained baseless criminal prosecutions against him by unjustifiably crediting Klingerman's statements; by failing to properly investigate or seek credible evidence of his criminal wrongdoing, and by knowingly submitting false or misleading information to the courts in support of the arrest warrants, all in violation of 42 U.S.C. § 1983. Beauchamp also raised claims under state law for false arrest and defamation based on the statements published in the *Daily Ledger*. Additionally, Beth claimed that Milligan and the Sheriff of Marion County intentionally committed the tort of outrage during the execution of the warrants at her home.

The district court granted summary judgment in favor of all defendants. On Beauchamp's § 1983 claims, the court concluded that Detectives Milligan and Dukette enjoyed qualified immunity from suit because probable cause existed to seek both of his arrests; that neither Weidner nor the sheriffs were personally responsible for any of the alleged deprivations; and that there was no evidence supporting a *respondeat superior* liability claim against Noblesville. Regarding the Beauchamps' claims under state law, the district court determined that the existence of probable cause to support Beauchamp's two arrests defeated his false arrest claims; that Beauchamp had failed to show that any named defendant was responsible for the statements published in the *Daily Ledger*; and that Beth's claim of outrage against

Milligan failed because his conduct was not sufficiently outrageous.

**II.**

On appeal, Beauchamp argues that the evidence, when viewed in the light most favorable to him, shows that there was no probable cause to arrest him either for attempted residential entry or for rape, so that Detectives Milligan and Dukette cannot claim qualified immunity from suit under § 1983, and that his state law claim for false arrest should proceed. Beauchamp further argues that there is sufficient evidence in the record to support an inference that Dukette was the source for the *Daily Ledger* article. Finally, Beth Beauchamp contends that the district court erred in determining that Milligan's conduct during the execution of arrest and search warrants at her home was not sufficiently outrageous to support a claim of outrage. The Beauchamps have abandoned all issues concerning the conduct of Weidner, the two sheriffs, and the City of Noblesville by not developing any arguments in their briefs challenging the summary judgments in their favor. *See Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). We review *de novo* the district court's decision to grant summary judgment, viewing the facts and making all reasonable inferences that flow from them in the light most favorable to the non-moving parties. *Abrams v. Walker*, 307 F.3d 650, 654 (7th Cir. 2002). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact for trial and that the moving parties are entitled to judgment as a matter of law, Fed. R. Civ. P. 56(c), or that the non-moving party cannot establish an element essential to his claim on which he will bear

the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**A.**

The threshold question in determining whether Milligan and Dukette enjoyed qualified immunity from a suit for damages on Beauchamp's claims under § 1983 is whether the facts, when viewed in the light most favorable to Beauchamp, show that the officers violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Newsome v. McCabe*, ___ F.3d ___, Nos. 02-1290, 02-2260, 02-2356 & 02-2357, 2003 WL 262479, at *1 (7th Cir. Feb. 10, 2003). Beauchamp asserts that Milligan and Dukette violated his rights under the Fourth and Fourteenth Amendments by causing him to be arrested without probable cause. Because each arrest was made pursuant to a facially valid warrant issued by a judicial officer, the detectives violated Beauchamp's rights only if reasonably well-trained officers in their positions should have known that the testimony or affidavits they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place. *Malley v. Briggs*, 475 U.S. 335, 345 (1986). To demonstrate this, Beauchamp had to identify evidence in the record showing that Milligan or Dukette, knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable case existed for the arrests. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). A "reckless disregard for the truth" is demonstrated by showing that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they

knew would negate probable cause. *See United States v. Whitley*, 249 F.3d 614, 620-21 (7th Cir. 2001); *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000).

Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed. *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). It existed in this case if, at the moment when Milligan sought the warrants for Beauchamp's arrests, the facts and circumstances within his knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person in believing that Beauchamp had committed the crimes. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Nieman*, 232 F.3d at 580. In determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, we look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight. *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994). The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate. *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2001); *Neiman*, 232 F.3d at 581; *Guzell v. Hiller*, 223 F.3d 518, 519-20 (7th Cir. 2000); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998); *Tangwall v. Stuckey*, 135 F.3d 510, 516-17 (7th Cir. 1998); *Hebron*, 18 F.3d at 422-23; *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988); *Gramenos v. Jewel Cos, Inc.*, 797 F.2d 432, 439-40 (7th Cir. 1986). And in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth. *Spiegel v. Cortese*, 196 F.3d 717, 724-25 (7th Cir. 2000); *Gramenos*, 797 F.2d at 442.

Beauchamp first contends that Milligan had no probable cause to seek his arrest for attempted residential entry because there was no information available to Milligan suggesting that a crime had been committed. Specifically, Beauchamp notes that Klingerman did not hear the person at her door scratching it or attempting to pry it open, nor did she observe the person holding any implement. He also notes that, by Klingerman's account, the incident concluded well before the police arrived, which he contends suggests that the person at Klingerman's door was not acting culpably by fleeing out of fear of arrest. All of this, he believes, shows only that someone "was knocking on the door seeking permission to enter." Moreover, Beauchamp contends that Milligan willfully ignored both his claim that he was at home during the incident, and further notes that his pocket knife could not be connected to the marks on Klingerman's door.

Indiana defines attempted residential entry as taking a substantial step toward knowingly or intentionally breaking into and entering the dwelling of another. Ind. Code §§ 34-41-5-1(a), 35-43-2-1.5. When Milligan applied for the warrant he knew that Klingerman had reported to him that someone was "pounding" on her door yelling her name; that she was frightened enough to put her children in a room, shut the door and call 911; that prior to the incident she had claimed that Beauchamp sexually harassed her; that she believed the person at her door sounded like and fit the general of description Beauchamp; and that when he observed Beauchamp later on the day of the attack, Beauchamp substantially matched the description Klingerman gave to him. Milligan also had observed what appeared to be fresh pry marks on Klingerman's door, and Klingerman had told him that she had not noticed the marks before the incident. And he also was aware that Danelle Ooley, who had encountered Beauchamp under circumstances similar to Klingerman,

had accused Beauchamp of sexual battery. This was the substance of what Milligan told the judicial officer, and it was sufficient to establish probable cause to believe that Beauchamp had committed the crime. That Milligan did not heed or further investigate Beauchamp's claim of alibi does not change this result. First, criminal suspects frequently protest their innocence, and a suspect's denial of guilt generally is not enough to trigger a duty to investigate in the face of a reasonably believable witness and readily observable events. *See Hebron*, 18 F.3d at 422-23. Second, once an officer learns sufficient trustworthy information establishing probable cause, he is entitled to rely on what he knows in pursuing charges or an arrest, and is under no further duty to investigate. Although a potentially solid claim of alibi might warrant more credit than a bald assertion of innocence, Beauchamp's claim in this case would not have conclusively established his whereabouts—all it would have shown is that someone was using his computer. The same goes for the failure of the police to connect Beauchamp's pocket knife to the marks on Klingerman's door. Because it was not possible to make an accurate cast of the marks, the police could not determine what instrument was used to make the marks.

As for the charge of rape, Beauchamp argues that Milligan and Dukette should have questioned Klingerman's story and undertaken additional investigation because she did not immediately reveal that she was raped; she likely held a grudge against Beauchamp as evidenced by the complaint she filed with the Fishers Police Department; her initial polygraph answers were inconsistent; and her later polygraph examination and her questionable allegations of receiving harassing telephone calls from Beauchamp show that she was not someone that Milligan and Dukette should have believed. Furthermore, Beauchamp asserts that Milligan misrepre-

sented the results of Klingerman's initial polygraph exam to the court by not stating at the probable cause hearing that the state's polygraph examiner had concluded that Klingerman was telling the truth when she stated that "someone unknown" to her had attacked her in her home.

As an initial matter, Detective Milligan did not apply for the warrant based on Klingerman's assertions alone. In addition to her allegations and identification of Beauchamp, Milligan observed firsthand Klingerman's injuries and demeanor right after the incident and her demeanor when she announced she had been raped; Milligan was intimately familiar with the circumstances surrounding the attempted break-in at Klingerman's home and Ooley's claim that she was attacked by Beauchamp; and Milligan was aware that an independent witness had corroborated Klingerman's description of Beauchamp as he appeared shortly before the incident, as Dukette discovered.

What is more, Milligan and Dukette's reliance on Klingerman's complaints was reasonable. Even if Klingerman's story had inconsistencies, the officers were under no constitutional obligation to exclude every possibility that she was not telling the truth, unless the inconsistencies were such that a reasonable officer would become suspicious. *See Neiman*, 232 F.3d at 581; *Hebron*, 18 F.3d at 423. Klingerman's failure to immediately notify the police that she had been raped and the answers she gave at her initial polygraph examination were not suspicious under these circumstances. Considering that her attacker wore a ski mask, Klingerman may have harbored some uncertainty that it was Beauchamp. Her behavior also could be consistent with that of a person who was raped. For instance, recognized symptoms of rape trauma syndrome, a pattern of symptoms used to describe the emotional and psychological responses that a person may

experience before, during, or after a rape,[2] include not immediately reporting the rape or telling anyone of the assault and the inability to form clear and vivid memories of the event. *See* Morrison Torrey, *When Will We Be Believed? Rape Myths & The Idea of a Fair Trial in Rape Prosecutions*, 24 U.C. Davis L. Rev. 1013, 1044 & n.150 (1991); Arthur H. Garrison, *Rape Trauma Syndrome: A review of Behavioral Science Theory and Its Admissibility in Criminal Trials*, 23 Am. J. Trial Advoc. 591, 618-22 (2000). Evidence that a putative rape victim suffers from rape trauma syndrome is admissible in the courts of Indiana to assist the jury in understanding a victim's behavior before, during, and after a rape, *see Simmons v. State*, 504 N.E.2d 575, 579 (Ind. 1987), so it would be reasonable for an officer in Milligan's position to not place great emphasis the victim's failure to report a rape promptly or inability to recall the details of the crime clearly. More importantly, it is not the function of the police to establish guilt; the responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts. *Gerald M.*, 858 F.2d at 381; *Gramenos*, 797 F.2d at 438-39; *see also Hebron*, 18 F.3d at 423 (police officers "have a hard time evaluating competing claims about motive; they are entitled to act on the basis of observable events and let courts resolve conflicts about mental states."). The recognized difficulties in prosecuting cases of rape and assessing the credibility of putative rape victims and suspects in criminal trials underscores this principle. *See, e.g.*, David P. Bryden & Sonja Lengnick, *Rape in the Criminal Justice System*, 87 J. Crim. L. & Criminology 1194, 1322 (1997).

---

[2]   Ann Wolbert Burgess & Lynda Lytle Holmstrom, *Rape Trauma Syndrome*, 131 Am. J. Psychiatry 981 (Sept. 1974).

A good bit of Beauchamp's argument that Klingerman should not have been believed rests on events that occurred well after his arrests and the fact that all of the charges against him were eventually dropped. All acquittals and terminated prosecutions do not lead to liability under § 1983, however. *Boyce v. Fernandez*, 77 F.3d 946, 950 (7th Cir. 1996). The only facts relevant to determining whether probable cause existed are those known to the police when they apply for a warrant. *Hebron*, 18 F.3d at 423. Furthermore, because Milligan acted reasonably in relying on Klingerman's allegations, Beauchamp cannot undercut the finding of probable cause by claiming that the police failed to introduce other facts at the hearing unless he can show that Milligan knew that the testimony he provided was untrue. *Gramenos*, 797 F.2d at 440. Once an officer has established probable cause on every element of a crime, he need not continue investigating to test the suspect's claim of innocence. *Id.* at 437-42; *Kelley v. Myler*, 149 F.3d 641, 646-47 (7th Cir. 1998) ("Probable cause does not depend on the witness turning out to be right; it's what the police know, not whether they know the truth that matters."). Because Milligan and Dukette had probable cause to apply for warrants to arrest Beauchamp for attempted residential entry and rape, they enjoyed qualified immunity from suit under 42 U.S.C. § 1983. And likewise there exists no genuine issue of material fact as to whether the officers committed the tort of false arrest—under Indiana law, proof of the absence of probable cause is essential to sustain a claim of false arrest. *Conwell v. Beatty*, 667 N.E.2d 768, 775 (Ind. Ct. App. 1996).

**B.**

Beauchamp next argues that there exists a triable issue of fact whether Detective Dukette was the source of the

information reported in the *Daily Ledger*. In her deposition, Dukette flatly denied speaking to the newspaper, and also claimed she could not recall speaking about Beauchamp's case with Curtis Kinman, who was quoted as the source of the article. She conceded, however, that she would have told Kinman about Beauchamp's case if he asked her for the information, and Beauchamp asserts that the inferences that could be drawn from the concession suggest that Dukette may have spoken to Kinman. But even if it can be inferred that Dukette was the source, summary judgment still was appropriate because Beauchamp's claim fails as a matter of law. In Indiana, a private individual bringing a defamation action in cases where the alleged defamatory statement is a matter of public or general concern, such as this one, *see id.* at 774-75, must prove "actual malice," meaning that the statement was published with knowledge that it was false or made with a reckless disregard for the truth. *Journal-Gazette Co. v. Bandico's, Inc.*, 712 N.E.2d 446, 452 (Ind. 1999) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). To prove that a statement was published with a reckless disregard for the truth, a defamation plaintiff must identify sufficient evidence permitting the conclusion that the defendant in fact entertained serious doubts as to the truth of the statement. *Poyser v. Peerless*, 775 N.E.2d 1101, 1107 (Ind. Ct. App. 2002). "Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Journal-Gazette*, 712 N.E.2d at 456 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

The article reported that Beauchamp had been arrested for rape and other crimes; that the arrest came after Beauchamp attacked a "Noblesville woman" in her home; and that the police believed that Beauchamp was involved in other crimes and "desperately" wanted information from the public. Although in hindsight some of these

statements may or may not have been true, there is nothing here suggesting that when uttered Dukette entertained doubts about the truth. The information upon which the utterer based the statement was substantially the same information presented to the court in Detective Milligan's probable cause affidavits, and the court concluded that there existed a probability that Beauchamp had raped Klingerman. The police also were aware of other crimes allegedly committed by Beauchamp, namely Danelle Ooley's allegation of sexual battery. The fact that Indiana eventually dropped the rape charge does not establish a reckless disregard for the truth. *See Conwell*, 667 N.E.2d at 774-75 (publication by police of facts supporting arrest warrant were not made with a reckless disregard for the truth, even after a jury acquitted the plaintiff).

## C.

Last, we are left with Beth Beauchamp's claim that Detective Milligan committed the tort of outrage, or intentional infliction of emotional distress, during the execution of the arrest and search warrants at her home on the night of April 24, 1998. The tort is established by proving that the defendant intentionally or recklessly engaged in extreme and outrageous conduct, and that the defendant's conduct caused the plaintiff severe emotional distress. *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 691 (Ind. 1997). The courts of Indiana have adopted the definition of "extreme and outrageous conduct" suggested in the commentary to § 46 of the second Restatement of Torts, which describes such conduct as

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in

> which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d. (1965)).

Beth claimed that Milligan intentionally caused her severe emotional distress by calling her a "bitch" in conjunction with searching her home in an "outrageous fashion." Milligan acknowledges that, if he said this word, his conduct was inexcusable and unprofessional, but he nevertheless contends that using profanity in this limited instance, even in conjunction with the activity surrounding the execution of the warrants, did not rise to the level of extreme and outrageous conduct. We agree. The Indiana courts have sustained summary judgments for defendants in much more extreme cases. *See Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) defendant forcibly entered plaintiff's home and threatened him with a gun, while aware that the plaintiff feared guns); *Gable v. Curtis*, 673 N.E.2d 805, 809-11 (Ind. Ct. App. 1996) (creditor called debtor seven times in an hour screaming and threatening to repossess debtor's home, and warning that debtors "would pay"). And although the rough treatment she claimed she received from the police, if true, was unfortunate, Beth did not identify Milligan as one of the officers who mistreated her. Nor did she name any other officer present at the search whom she claims mistreated her as a defendant. Summary judgment was thus appropriate on this claim.

### III.

We agree with district court that Detectives Cary Milligan and Cynthia Dukette enjoyed qualified immunity from suit for damages under 42 U.S.C. § 1983, and that summary judgment was appropriate on Ricky and Beth

Beauchamp's claims under Indiana law for false arrest, defamation, and outrage. Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

               _____

               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*