# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3669

JOSEPH R. ANDERER, JR.,

*Plaintiff-Appellant,*

v.

POLICE CHIEF ARTHUR JONES, *et al.,*

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-668—**J.P. Stadtmueller**, *Judge.*

———————

JUNE 21, 2005

———————

Before FLAUM, *Chief Judge*, and POSNER, COFFEY,
EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, WOOD,
EVANS, WILLIAMS, and SYKES, *Circuit Judges*. Plaintiff-
Appellant filed a petition for rehearing and rehearing en
banc on October 18, 2004. In response to this petition, the
panel amends its opinion as follows.

The first full sentence on page 10 of the slip opinion dated
October 6, 2004 is deleted and replaced with:

"Given these circumstances—a 12-year-old's bloody
appearance and injuries consistent with being hit in the
mouth, his consistency in reporting how he had been

injured, and that no other officer observed JR in that condition prior to turning him over to Anderer's sole custody[8]—we believe the Milwaukee police officers had probable cause to believe that Anderer had intentionally or recklessly caused JR's bodily injury. *See* Wis. Stat. § 948.03."

A majority of the judges on the panel voted to deny rehearing. Thereafter, Judge Coffey called for a vote on Anderer's petition for rehearing en banc and Chief Judge Flaum, with Circuit Judges Manion and Kanne, voted to grant rehearing en banc, but a majority of the active judges did not favor rehearing en banc. Accordingly, the petition is denied.

COFFEY, *Circuit Judge*, dissenting. This court has consistently held that police officers "are not relegated to a watered-down version of constitutional rights." *Anderer v. Jones*, 385 F.3d 1043, 1076 (7th Cir. 2004) (Coffey, J., dissenting) (quoting *Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002)). Nevertheless, the majority's reasoning and holding in *Anderer v. Jones* does just that. As recorded, the majority's opinion not only creates bad law, but more importantly violates the parameters of the Fourth and Fifth Amendments to the United States Constitution. 385 F.3d at 1043-53. Most striking is the majority's approval of the Milwaukee Police Department's ("MPD") attempt to force Anderer to give a statement while he was a suspect in a criminal investigation. Also, the utilization of Anderer's failure to respond to such questioning as a factor establishing probable cause constitutes a clear violation of his Fifth Amendment right to remain silent as well as his

contractual employment right not to give a statement without a representative present. Because I feel that this court has failed to fulfill its obligation under the Federal Rules of Appellate Procedure in denying Anderer a rehearing en banc, and has perpetuated a flawed decision recently handed down as precedent, I dissent from the denial of the petition for rehearing en banc. *See* FED. R. APP. P. 35 (stating that an en banc rehearing is favored in order to "secure or maintain uniformity of the court's decisions," or where "the proceeding involves a question of exceptional importance").

The Fifth Amendment to the Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Like every other private citizen or criminal, law enforcement officers are likewise protected under the Fifth Amendment privilege against self-incrimination, which prevents the "government [from] forc[ing] a person to make a statement, even out of court, that might be used as evidence that he had committed a crime." *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 990 (7th Cir. 2002). The right to remain silent under the Fifth Amendment is one that our founding fathers viewed, and to date we still view, as vitally important. As such, the parameters of this plenary right have remained intact over the last 226 years. *See, e.g.*, *Hoffman v. United States*, 341 U.S. 479, 486 (1951); *accord Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892) (holding that the Fifth Amendment protection against self-incrimination "must have a broad construction in favor of the right which it was intended to secure"). The United States Supreme Court has recognized the breadth of this privilege in many, many decisions, the most recent being *Hiibel*, where the Court reiterated the principle that as long as a suspect has an "articulated real and appreciable fear that [the information sought might] be used to incriminate him, or 'would furnish a link in the chain of evidence needed to prosecute' him,"

the privilege attaches and must be honored. *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 124 S.Ct. 2451, 2461 (2004) (citing *Hoffman*, 341 U.S. at 486). No Supreme Court decision, nor any case law presented to this panel has ever held that a suspect in a criminal investigation's refusal to respond to a potentially incriminating, testimonial and compelled inquiry may be used to elevate mere reasonable suspicion to probable cause. *See id.* at 2460; *Tom v. Voida*, 963 F.2d 952, 959 n.8 (7th Cir. 1992).

Despite this clear and unambiguous mandate forbidding the use of a criminal suspect's silence against him, the district court, Judge J.P. Stadtmueller, presiding, proceeded to use Anderer's repeated refusals to answer any questions (as well as Anderer's refusal to speculate as to what caused JR's nosebleed) against him. The trial judge began by finding "THAT J.R.'S STATEMENT, BY ITSELF MAY NOT HAVE BEEN SUFFICIENTLY RELIABLE OR TRUSTWORTHY TO PROVIDE A BASIS FOR PROBABLE CAUSE." *Anderer v. Jones*, 342 F. Supp. 2d 799, 803 (E.D. Wis. 2002) (emphasis added). However, in a curious about-face, the trial judge then went on to impermissibly allow Anderer's refusal and "inability to explain J.R.'s nose bleed" (which in reality was a refusal to answer) to be used against him. *Id.* In concluding that the MPD had probable cause to arrest Anderer, the trial judge somehow found that "J.R.'s bloody nose, the time Anderer spent alone with J.R. [in the squad car (122 seconds)], *and Anderer's inability to explain the cause of J.R.'s bloody nose* [were] factors sufficient to supplement any possible lack of credibility in J.R.'s statement." *Id.* at 804 (emphasis added). This error in reasoning was damaging enough, but the mistake was compounded when the majority (without any citation of legal authority) approved of this flawed reasoning and once again incorporated Anderer's REFUSAL TO ANSWER against him as a factor when establishing probable cause.

The majority opinion, as originally written, states:

> Anderer offered no explanation to the investigating officers for how JR's injuries might otherwise have occurred, and appears only to have inquired about what JR claimed Anderer had hit him with. Given these circumstances—a 12-year-old's injuries and bloody appearance, his consistency in reporting how he had been injured, and *Anderer's total failure to provide any explanation for the injuries* when no other officer observed JR in that condition prior to turning him over to Anderer's sole custody—we believe the Milwaukee police officers had probable cause to believe that Anderer had intentionally or recklessly caused JR's bodily injury.

*Anderer*, 385 F.3d at 1050 (emphasis added). Not only does this passage incorrectly characterize the information in the record, as thoroughly discussed and documented in my dissent, *see Anderer*, 385 F.3d at 1075-76 (Coffey, J., dissenting), this holding is in strict contradiction of more than 200 years and volumes of case law which support Anderer's right to be protected from self incrimination. *See id.*; *see also Hoffman*, 341 U.S. at 486. After all, a person "may not be detained . . . without reasonable, objective grounds for doing so; and his refusal . . . to answer does not, without more, furnish those grounds." *Florida v. Royer*, 460 U.S. 491, 498 (1983) (citing *United States v. Mendenhall*, 446 U.S. at 556).

In an effort to defray and bypass the unconstitutional underpinnings of this approach the majority subsequently amended its original opinion. However, the majority's opinion, even with the newly incorporated changes, <u>can only be interpreted as holding </u>that a criminal suspect's refusal to answer in the face of questioning by law enforcement authorities may be used as a factor establishing probable cause. As changed, the paragraph, in pertinent part, reads:

> Anderer offered no explanation to the investigating officers for how JR's injuries might otherwise have

occurred, and appears only to have inquired about what JR claimed Anderer had hit him with. Given these circumstances . . . we believe Milwaukee police officers had probable cause to believe that Anderer had intentionally or recklessly caused JR's bodily injury.

Majority Opinion (Revised 12/6/04) at *10. Thus, because even this majority's revised opinion, as written, continues to construe Anderer's silence against him as an element of probable cause—casting aside more than 200 years of clear and unambiguous case law—this court should not have gone on record as adopting this misapplication of the law and must somehow remedy this grievous error at the earliest possible opportunity. Anderer's repeated refusals to *speculate* as to the cause of JR's nosebleed were entirely consistent with his clearly established Fifth Amendment rights, and as such may not be used as a factor which would increase the "probability or substantial chance" that Anderer had committed a crime, thus elevating reasonable suspicion to probable cause. *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003).

Furthermore, not only did the majority's misapplication of Anderer's invocation of his Fifth Amendment right not to answer questions against him violate his constitutional rights, but this illegal invasion also ran afoul of Anderer's clearly enumerated contractual rights under his employment agreement with the Milwaukee Police Department. The MPD Rules and Regulations, Rule 3/450.05(D)(8) clearly mandates that: "*In an investigation that requires an immediate interview, the [officer] will be allowed a reasonable opportunity to obtain the presence of and to consult with a representative of his/her choice before and during the interview*." However, an officer may be forced to give a statement by a supervising officer if, before being compelled to speak, that officer is told that he will receive "*immunity*

*from criminal prosecution on the basis of [the answers given]*." *Driebel*, 298 F.3d at 638, n.8 (quoting *Atwell*, 286 F.3d at 990).

Despite the fact that Anderer's request to consult with a representative of his choice was never granted, investigating officers from the Internal Affairs Division ("IAD") of the MPD attempted to coerce a statement from him, in clear violation of their own rules as well as Anderer's contractual rights. Indeed, at one point in the investigation IAD officers, in another attempt to get a statement out of Anderer, threatened that they were going to call a superior officer to "PI-21" him.[1] However, the IAD officers, in this instance, violated their own rules and regulations by failing to explain to Anderer that before being compelled to respond to questioning he would have to be granted immunity from criminal prosecution on the basis of any questions asked or responses given. *See Driebel*, 298 F.3d at 638; *see also Anderer*, 385 F.3d at 1074 (Coffey, J. dissenting) (citing MPD Rule 3/450.05 *et seq.*). Instead, IAD officers used the threat of initiating the "PI-21" procedure in an attempt to coerce Anderer into answering their questions before granting him immunity or furnishing him with a representative; all the while knowing that if Anderer had complied and given such a statement he would be waiving his Fifth Amendment, as well as his contractual, rights.

Knowing and understanding his rights, Anderer steadfastly refused to respond to questioning much less speculate as to what caused JR's spontaneous nosebleed, thus exercising a right reserved to him under the Fifth Amendment as well as his contract with the MPD. On another occasion,

---

[1] Meaning that they were going to get a sergeant to compel and force Anderer to give a statement under threat of demotion, disciplinary action or even discharge. See MPD Rule 3/450.05 *et seq.*

when asked if he was willing to give a statement, Anderer patently and emphatically refused stating that he "absolutely [would] not, not without union representation." However, the IAD, the district court as well as the majority all saw fit to ignore Anderer's guaranteed rights under the Constitution, not to mention his contractual rights, and went so far as to use his repeated refusals to answer as a factor to elevate reasonable suspicion to the level of probable cause to arrest. This court's approval of such a double standard for a police officer undermines age-old precedent holding that police officers (even those accused of not abiding by the law) are not to be treated as second-class citizens and are likewise "not relegated to a watered-down" set of legal and constitutional rights. *Driebel*, 298 F.3d at 637. A holding, such as the majority's, is unacceptable and constituted a grave injustice that this court could and should have remedied in an en banc proceeding in order to "secure and maintain uniformity of the court's decisions" as proscribed by FED. R. APP. P. 35.

As mentioned above, the only legally cognizable grounds that the IAD had for arresting Anderer was their reliance on a fabricated statement as true from an unreliable, profane, disturbed and psychotic juvenile witness. *See, e.g., Anderer*, 385 F.3d at 1058 (prior to Anderer's arrest "Officer Shoman informed the IAD investigators that JR was a known trouble-maker who had proven to be a constant problem in her patrol area.") (Coffey, J. dissenting). However, based on JR's statement alone, the MPD was without sufficient reason to believe that Anderer had committed a crime and lacked probable cause to arrest him, thus constituting a clear violation of the Fourth Amendment to the United States Constitution.

The Fourth Amendment protects every United States citizen's right "to be secure in their houses, persons, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend IV. It is true that probable cause "is a

fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). Although probable cause is "incapable of precise definition or quantification into percentages," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), the Supreme Court has concluded that, *sin qua non*, "probable cause is a reasonable ground or belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949), *accord Carroll v. United States*, 267 U.S. 132, 161 (1925). This requires that we determine "whether [the] historical facts, viewed from the standpoint of an objectively reasonable police officer amount to . . . probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

The question of whether the investigating police officers, when confronted with a completely unreliable witness, had a duty to investigate further is one of utmost importance. *See, e.g., Driebel*, 298 F.3d at 628; *see also* FED. R. APP. P. 35 (stating that an en banc rehearing is warranted where "the proceeding involves one or more questions of exceptional importance"). Indeed, the juvenile complainant's credibility was thoroughly undermined by a plethora of contradictory evidence as well as his display of uncontrolled, profane and psychotic behavior. *See, e.g., Driebel*, 298 F.3d at 628-32 (7th Cir. 2002); *see also Anderer*, 385 F.3d at 1082 (Coffey, J., dissenting) (quoting O'Grady Psychiatrist Report, Anderer Aff., Ex. 29 at 1) (Dr. O'Grady, a psychiatrist who had examined JR just a week before the incident stated in his report that the juvenile had been prescribed various medications for his present and documented psychiatric disorders (schizophrenia, depression and anxiety disorder) and had also been diagnosed as suffering from "paranoia and auditory hallucinations [in which] voices were telling him to harm himself, [and] others"). As the presiding trial court judge stated: "J.R.'s statement alone [was] an insufficient basis for probable cause . . . . After all, if J.R. could

manufacture one obvious lie (rape allegation) against an officer, he might also manufacturer a more plausible lie against a different officer." *Anderer*, 342 F. Supp. 2d at 802-03. However, instead of continuing their investigation after being made aware of JR's unreliability—as officers are required by law to do—the IAD investigators proceeded to ignore the exculpatory statements of witness Officer Shoman and systematically failed to timely interview a number of others[2] prior to arresting Anderer. *See Spiegel v. Cortese*, 196 F.3d 717, 723-24 (7th Cir. 1999).

It is uncontroverted that throughout his encounter with the police on April 17, 2001, JR acted in an out-of-control manner that suggested he was a very (psychologically and emotionally) troubled individual. For example, prior to levying his assault accusation against Anderer, JR had repeatedly accused another officer, Officer Cook, of attempting to "rape" him, which was a wild and completely unsupported claim.[3] The trial judge, Judge Stadtmueller, recognized the import of this baseless accusation when he stated: "Anderer raises serious issues concerning J.R.'s credibility by showing that J.R. made fanciful allegations against another officer." *Anderer*, 342 F. Supp. 2d at 803. Also, JR, rather than continuing to assert his ridiculous accusation against Cook that he had been "raped," later changed his tune when talking to IAD investigators and admitted that he had only been "nudged" with a flashlight; a turn of events that also helps serve to undermine JR's credibility, as well as the unsupported conclusion of the IAD

---

[2] These witnesses include Officers Cook, Centeno, Logan and Bohlen, and one lay witness, Mitchell; all of whom would have exonerated Anderer.

[3] The record shows that what in fact happened was that Cook "nudged him on his buttock with a flashlight," see *Anderer*, 385 F.3d at 1068 (Coffey, J., dissenting); a far cry from the "rape" accusation which JR repeated to a number of officers.

and the majority that JR was "consistent in reporting how he had been injured." *Anderer*, 385 F.3d at 1050. In addition, JR, when initially interviewed, stated that he had been struck in the face as he was entering Anderer's police vehicle at the marina, but subsequent to Anderer's arrest changed this part of the fabrication also and now stated that, during the drive to the District 2 station, Anderer had "stopped the car," got out of the driver's seat, "opened the back door" and proceeded to strike him in the face. *Id.* at 1046. The reality of the situation is that the officers were dealing with a rambling, psychotic and delusional child who had recently been diagnosed as experiencing "PARANOIA AND AUDITORY HALLUCINATIONS [IN WHICH] VOICES WERE TELLING HIM TO HARM HIMSELF, OR TO HARM OTHERS." *See Anderer*, 385 F.3d at 1082 (Coffey, J. dissenting) (citing O'Grady Psychiatrist Report, Anderer Aff., Ex. 29 at 1 (emphasis added)). With reference to the doctor's report, it makes sense that JR would harm either himself or attempt to harm officers by making spurious "rape" allegations against one officer, Cook, and claiming that another officer, Anderer, had hit him.

In addition to making these ridiculous allegations against Cook, as well as being inconsistent in his recitation of the events of that night, the evidence in the record establishes that JR was not a credible or trustworthy witness. JR displayed no physical signs of injury whatsoever anywhere on his face which fails to establish that he had been hit or struck or assaulted in any manner by a 200 lb. police officer. *See id.* at 1072 (Coffey, J., dissenting). In addition, his aggravated, out-of-control conduct and suspicious demeanor that night should have rendered his recitation of the alleged events of that evening completely unreliable, thus requiring a reasonable officer to investigate further. *See Hebron v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994) ("Sometimes information from or about a person claiming to be the victim of crime would lead a reasonable officer

to be suspicious, making further investigation prudent—
and because the 'reasonableness' standard of the fourth
amendment [sic] links the constitutional obligation to the
standard of prudent conduct, the officer must do more.").

Indeed, MPD officers had ample information that night
that should have completely destroyed JR's credibility, to
name just two: (a) that JR was supposed to be taking no
less than three psychotropic drugs at the time of his arrest;
and (b) that he had failed to take his medication that day,
making him a menace and possible danger to himself and
others. *See Anderer*, 385 F.3d at 1058 n.3 *and accompany-
ing text* (Coffey, J., dissenting). The record clearly estab-
lishes the fact that officers knew that JR had been pre-
scribed, and was supposed to have been ingesting, a variety
of psychotropic medications, and that he had failed to take
those medications that very day. *Id.* at 1046.[4] Also, when
contacted, JR's mother urged officers to "release[ ][him]
from custody as soon as possible in order that he might
ingest his medication immediately." *Id.* at 1058 (Coffey, J.,
dissenting). The majority contends that "the fact that
investigating officers knew about JR's [psychotropic]
medication does not *ipso facto* negate JR's credibility or
require the officers to further investigate." *Id.* at 1050.
However, the majority's argument is a red herring. JR's
failure to take his psychotropic medications that evening
certainly should have alerted the allegedly intelligent, well-
trained and seasoned investigating officers to the fact that
a more detailed and thorough investigation into JR's

---

[4] Subsequent to JR having made his spurious allegations against
Anderer, Cook called JR's mother to inform her that her son was
in custody. *Id.* While talking with Cook, "JR's mother admitted
that she was not surprised that JR had been arrested for burglary
and advised Officer Cook that JR was taking several prescription
medications, including two that Officer Cook recognized as pills to
'help control a person's mental state.'" *Id.*

allegations was necessary given the disturbed mental state of the purported victim witness they were dealing with. Also, when JR's failure to take his psychotropic medicines is viewed in light of all the wealth of other evidence undermining his credibility—such as: (1) his spurious rape allegations against Officer Cook; (2) the lack of any physical evidence suggesting that he had been injured in any way; (3) the lack of any evidence corroborating JR's version of events; and (4) his inconsistency in reporting the alleged abuse—JR's mental status, failure to take his medicine that day and out-of-control behavior certainly establish that *JR was patently untrustworthy, unreliable and certainly not credible as a witness or believable as a purported victim*.

It is true that "*as long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest*." *Spiegel*, 196 F.3d at 723 (emphasis added). This most assuredly was not the case here; JR was not a reasonably credible witness. The trial court so found in holding that "J.R.'s statement, by itself, may not have been sufficiently reliable or trustworthy to provide a basis for probable cause." *Anderer*, 342 F. Supp. 2d at 803. Therefore, because JR was not a credible witness, the IAD's investigating officers were, by law, required to conduct further investigation into JR's allegations of abuse; and if they had, the IAD would have discovered and been convinced beyond a shadow of a doubt that Anderer had not committed any crime. *See Beauchamp*, 320 F.3d at 743.

The great weight of the evidence in this case, including the sworn statements of six police officers and one lay witness, establishes the fact that Anderer did not strike JR at any time on the evening of April 17, 2001. Indeed, not one living, breathing human being was ever found that could corroborate JR's fabricated claim that he had been struck by Anderer. Had investigators done what is legally (and ethically) required of them and investigated the matter

in a more thorough manner (instead of conducting what can only be described as an orchestrated and preconceived cursory inquiry), they would have uncovered a wealth of evidence exonerating Anderer. At the marina, where JR claimed he was struck by Anderer, lay witness James Mitchell observed the totality of Anderer's interaction with JR, and stated that he: "Watched every step of the way while Officer Anderer was taking [JR] to his squad car [and as] Officer Anderer guide[d] [JR] into the back seat of the squad, [he] saw Officer Anderer seatbelt JR, close the door securing him in the back of the squad and . . . [a]t no time did [he] see Officer Anderer strike [JR] or act in any abusive manner toward him . . . [instead, Mitchell commented that] at all times . . . Anderer acted in a very professional manner [towards JR]." *Anderer*, 385 F.3d at 1084 (Coffey, J., dissenting). In addition, six police officers testified that they did not observe Anderer abuse or even yell at JR, much less punch him in the face as he was being put into the police conveyance (as was claimed by the abusive, foul-mouthed and out-of-control JR). For instance, Officer Bohlen, who was on the scene and had "a direct vantage point" failed to "notice anything out of the ordinary when Officer Anderer placed JR in his squad." *Id.* (Coffey, J. dissenting). Also, Officer Cook testified that Anderer had not "encountered any difficulty placing JR into his squad," adding that he "would have been in a position to have noticed any such commotion." *Id.* at 1086 (Coffey, J. dissenting).

If the MPD had performed a legally sufficient and unbiased investigation prior to Anderer's arrest, they would have learned from the officers on the scene that Anderer did not, at any time, strike or even raise his voice at JR before placing him in the squad car at the marina. Based on nothing more than pure speculation and conjecture the District Judge J. P. Stadtmueller stated (and the majority joined in the speculation) that Anderer may have hit JR

sometime after leaving the marina by citing "the time in which JR was alone with Anderer in Anderer's car," as one of the circumstances which established probable cause. *Anderer*, 342 F. Supp. 2d at 803. The majority, as stated earlier, somehow perpetuated this grave error in judgment by relying on the fact that "no other officer observed JR [bleeding] prior to turning him over to Anderer's sole custody" as a reason "to believe that Anderer had intentionally or recklessly caused" JR to bleed. *Anderer*, 385 F.3d at 1049-50. However, the fact is that the record establishes, in no uncertain terms, that Anderer arrived at the police station, with JR secured in the back of his squad car, a mere 122 seconds after leaving the marina. *Id.* at 1081 (Coffey, J., dissenting). This extremely limited period of time falls far short of the amount of time necessary for Anderer to stop the squad car, turn off the ignition switch, remove the key from the ignition, unfasten his seatbelt, open the driver's side door, exit the vehicle, close the front door, open the rear door, proceed to hit the juvenile, close the rear door, reopen the front door, reenter the vehicle, re-fasten his seatbelt, insert and turn the key, and start the engine within 122 seconds, much less proceed to the station in addition within that period of time as JR claimed was the sequence of events after Anderer's arrest. Therefore, it is both inaccurate and disingenuous for the majority to speculate, as the trial judge did, and state that Anderer could have struck JR while conveying him to the District 2 police station when all recorded evidence, not to mention the evidence available to the MPD at the time (recall that JR did not say that he had been struck while in the car until after Anderer's arrest), suggests that this is impossible.

Probable cause to arrest Anderer was not established. To make matters worse, if the IAD had performed an independent and unbiased investigation, command officers and

the Chief of Police, Arthur Jones, would have realized not only that there was insufficient grounds to arrest Anderer, but that he (Anderer) was innocent. This conclusion is bolstered by the decision of the Milwaukee County District Attorney's office not to press charges against Anderer. In a memo dated June 7, 2001, Assistant District Attorney Jon Reddin stated:

> I have interviewed [JR], Anderer, officers Janice Shoman, Jeff Cook and Jeff Logan, and civilian James Mitchell. Based on those interviews I have concluded that we cannot prove how and by whom [JR]'s injuries were incurred, and consequently [I conclude that] no criminal charges can be sustained. . . . Whether Anderer struck him or he inflicted the injuries to himself by smashing his face into something in the back of the car will probably never be known to anyone but [JR] and Anderer. I cannot say with any assurance what happened. I believe it more probable, particularly in view of my knowledge of prior complaints against Anderer, that Anderer did strike [JR]. It is entirely conceivable, however, given [JR]'s agitation, mental problems and stated intentions to get money out of this incident, that he inflicted the injuries to himself."

*Id.* at 1062 (Coffey, J., dissenting). Not satisfied with this independent and unbiased result, the MPD's Chief Jones personally requested that District Attorney E. Michael McCann himself review the decision of his first assistant and, upon subsequent review, the District Attorney ratified Reddin's decision without further comment. *Id.* (Coffey, J., dissenting) This reluctance on the part of the District Attorney's office to find any legally sufficient basis for pressing charges in the complaint against Anderer is merely further evidence: (a) that the IAD failed to perform a good-faith investigation and instead conducted a result-driven,

pre-ordained sham investigation to disgrace Anderer; (b) that given JR's lack of credibility and trustworthiness the IAD should have investigated further due to the unreliability of the only witness, in which case, they would have uncovered evidence exonerating Anderer; and (c) that the information gained did not rise to the level of establishing probable cause to arrest Anderer.

I fully understand that the law does not require that, in every case, "a police officer conduct an incredibly detailed investigation at the probable cause stage," *Spiegel*, 196 F.3d at 724-25. However, a more thorough investigation was required here and, if accomplished in an independent and unbiased manner, would have conclusively established that probable cause to arrest Anderer did not exist. The IAD's failure to further investigate is a black mark on the MPD and violated Anderer's Fourth Amendment right to be secure in his "person[], papers, and effects, [as well as] against unreasonable searches and seizures." U.S. CONST. amend IV.

The majority's opinion (385 F.3d 1043), as written, creates bad law and violates Anderer's Fourth and Fifth Amendment rights as well as his contractual employment rights and should not be allowed to stand as precedent. The decision by this court to allow the majority's opinion to stand will undoubtedly cause concern and confusion on the part of law enforcement officers and the bar throughout this circuit. Police officers serve a vitally important function in our society and are entitled to the same constitutional protections as all United States citizens. The majority's endorsement of the denial of Anderer's protections under the Fourth and Fifth Amendments, as well as those guaranteed in his contract of employment, allows for the treatment of officers as second-class citizens. Thus, following the dissemination of this decision, law enforcement personnel will undoubtedly be concerned that, simply by doing their job and relying on the rights guaranteed them by the

Constitution and contract, they will be susceptible to arrest and/or termination without good cause.

A situation of this nature is unacceptable, and it is for these reasons that I am forced to object to the denial of a rehearing en banc. As noted above, a rehearing is favored: (a) in order to "secure or maintain uniformity of the court's decisions," or (b) where "the proceeding involves a question of exceptional importance." FED. R. APP. P. 35. In this case, both of these criteria—maintenance of uniformity and exceptional importance—should have warranted that the entire court consider the record and thoughtfully evaluate whether Anderer was entitled to his day in court in this case. The majority's decision supports an emasculation of over 200 years of criminal and constitutional law and must not be promulgated as precedent. Thus, an en banc hearing would have served the purpose of allowing the entire court to resolve the ambiguity which this decision has undoubtedly created for law enforcement officers and the bar throughout this circuit.

I respectfully dissent from the court's erroneous decision to allow the majority's decision in this case to stand as written.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*