In the

# United States Court of Appeals
### For the Seventh Circuit

No. 13-3367

TOLLIE CARTER,

*Plaintiff-Appellant,*

*v.*

CHICAGO STATE UNIVERSITY,
BIJESH TOLIA, and FARHAD
SIMYAR,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CV 00321 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 30, 2014 — DECIDED FEBRUARY 11, 2015

Before EASTERBROOK, KANNE, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Plaintiff Tollie Carter appeals the district court's grant of summary judgment for defendants Chicago State University ("CSU") and Farhad Simyar. He argues that CSU and Simyar retaliated against him in violation of the Family Medical Leave Act ("FMLA") and Section

1981 of the Civil Rights Act of 1866 ("Section 1981") by not appointing him acting department chair of CSU's Department of Accounting and Finance in November of 2008. Carter also claims that the district court abused its discretion in denying his motion to reconsider its grant of summary judgment. For the reasons expressed below, we affirm the judgment of the district court.

## I.    BACKGROUND

Carter holds a master of business administration degree ("MBA") and is a certified public accountant ("CPA"). CSU's College of Business hired him in 1986 as a temporary assistant professor in the Department of Accounting and Finance. In 1992, CSU granted Carter tenure and promoted him to associate professor. In January 1995, he was appointed department chair, and he held that position until June 1996, when he was removed by the university president. Since that time, he has held the position of associate professor. Carter is an African-American male.

There are two other relevant actors in this story. Simyar joined CSU as dean of the College of Business in July 2005 and served in that capacity through January of 2010. Defendant Bijesh Tolia began working at CSU in 1997. In the fall of 2007, he was promoted from his prior position as a department chair to associate dean of the College of Business.

### A. Carter's Prior Lawsuit

CSU offers its faculty the option to teach summer courses, contingent on the department's budget, program needs, student interest, and a rotation list of professors who timely submit requests to teach specific classes. The list changes

yearly depending on prior assignments, and it gives some preference to professors who are within four years of retirement. The department chair matches available professors with offered courses, subject to approval by the dean and a university-wide summer school committee. In the summers of 2006 and 2007, Carter was assigned to teach some, but not all, of the courses he requested.

Likewise, CSU assigns professors their courses for the fall and spring semesters based on teaching preferences, departmental need, and student demand. During the spring semester of 2007, CSU assigned Carter to teach Accounting 213, which met on Thursday evenings.

Carter did not take well to that assignment. Beginning on January 11, 2007, Carter called in sick every Thursday and did not teach any of his courses that met that day. Following numerous communications regarding his absences, Carter met with CSU administrators on April 10. During that meeting, Carter blamed his refusal to teach the Thursday classes on CSU's failure to accommodate his sleep apnea. After the meeting, he began teaching some of his Thursday courses, but continued to refuse to teach Accounting 213. Consequently, CSU's Assistant Vice President Debrah Jefferson recommended that Carter be sanctioned a certain percentage of his salary.

Carter's course assignments, among other complaints, formed the basis of a lawsuit he filed against CSU in August of 2007 ("*Carter I*"). There, Carter alleged that CSU was discriminating against him on the basis of race, gender, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), Section 1981, and the Americans with Disabilities Act ("ADA"). He later amended his complaint to

include Simyar and Tolia as individual defendants in the Section 1981 claim. In 2011, the district court entered summary judgment against Carter on all but one of his claims, and the parties settled the remaining claim in June of 2012.

*B. Spring 2008 FMLA Leave*

During the spring semester of 2008, Carter was scheduled to teach four courses. On January 22, after the start of the semester, Carter requested leave under the FMLA to care for his mother. CSU granted the request, and Carter took FMLA leave from January 29 through March 20, 2008. CSU hired a part-time professor to teach one of Carter's classes, and other professors within the Department taught the remaining three. When Carter returned from leave, CSU assigned him non-teaching duties for the remainder of the semester. Carter initially objected to the assignment, but he and CSU mutually resolved the dispute by mid-April of 2008.

*C. Chair and Acting Chair Appointments*

In April 2008, CSU's Department of Accounting and Finance began the process of appointing a new department chair. A chair appointment at CSU occurs through a multistep procedure. First, the faculty votes to recommend a candidate. Second, the dean of the College of Business reviews the faculty vote and determines whether he concurs with the faculty's selection. The dean then forwards the results of the faculty vote, along with his recommendation for the selection, to the provost. The provost and university president then discuss the appointment. The president ultimately decides who will be appointed chair, but usually follows the dean's recommendation.

Carter and another professor, Dr. Ernest Coupet, submitted their names as candidates for the faculty vote. Carter and Coupet tied in the faculty election, each earning four votes. After the vote, Coupet withdrew from consideration in order to promote unity within the department. Dean Simyar was not willing to recommend Carter to the president, however, and he asked Coupet to reconsider his candidacy. Simyar told Coupet that, if needed, Simyar would seek to fill the position with a candidate from outside the department, rather than recommend Carter. Coupet agreed to resubmit his name, and Simyar recommended Coupet to President Elnora Daniels. Daniels selected Coupet as chair in May 2008.

Simyar explained his lack of support for Carter's candidacy by citing a policy—either of CSU or of President Daniels—that the Chair should hold a PhD or other terminal degree. Daniels had previously rejected several candidates for other department chair positions because they lacked terminal degrees. Coupet held a PhD, and Carter held an MBA, which is not a terminal degree.

Simyar testified that he knew Daniels would not approve Carter's candidacy, since he lacked a terminal degree. At least three chairs of other departments, however, did not have PhDs at the time of Coupet's appointment.[1] In addition, in the same year that Simyar recommended Coupet, he recommended a professor for another Chair position, even though that professor's PhD was from an unaccredited institution.

---

[1] The appointment details regarding these other professors are not clear from the record.

Coupet's tenure as chair was short—he resigned in August, after about two months in the position. Simyar selected Professor Atha Hunt as acting chair in November 2008. It appears that CSU had a less formalized process for the selection of acting chairs—they were appointed by the dean without a faculty vote or any particular degree requirements.

*D. Procedural History*

In January 2010, while *Carter I* was still pending, Carter filed the instant suit against CSU, Simyar, and Tolia. Carter raised a multitude of claims arising under the FMLA, Section 1981, Title VII, and the ADA. Because he appeals from judgment on only two of those claims, we limit our discussion accordingly.[2]

Carter alleged that CSU, Tolia, and Simyar retaliated against him in violation of the FMLA and Section 1981 when they failed to appoint him department chair in May 2008 (the "chair" claim), and again when they failed to appoint him acting department chair in November 2008 (the "acting chair" claim). Carter alleged that Tolia, Simyar, and CSU did not select him for the chair and acting chair positions in retaliation for Carter having taken FMLA leave in 2008, and in retaliation for having initiated the prior lawsuit alleging race and gender-based discrimination.

Carter's chair claim survived the defendants' summary judgment motion, and proceeded to jury trial. The court is-

---

[2] The district court entered summary judgment against Carter on all of the claims not otherwise discussed in this opinion.

sued a directed verdict for Tolia, and the jury found in favor of CSU and Simyar. Carter does not appeal these rulings.

Carter's acting chair claim, however, did not survive the defendants' summary judgment motion. The court granted summary judgment in favor of Tolia, Simyar, and CSU. Carter filed a motion for reconsideration, which the court denied.

On appeal, Carter challenges the court's grants of summary judgment in favor of CSU on the FMLA claim and in favor of Simyar on the Section 1981 claim.[3] He also appeals the court's denial of his motion to reconsider.

## II. ANALYSIS

### A. Standard of Review

We review a grant of summary judgment *de novo*, "reviewing the record and the inferences drawn from it in the light most favorable to the nonmoving party." *Grayson v. City of Chicago,* 317 F.3d 745, 749 (7th Cir. 2003). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Retaliation Claims

The FMLA entitles any eligible employee to take up to twelve workweeks of leave during each twelve-month period in order to, among other things, care for a parent with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). The

---

[3] Carter does not appeal the district court's decision on any of his claims against Tolia.

FMLA also makes it unlawful for an employer to retaliate against an employee who exercises his FMLA rights. *Id.* § 2615(a)(2), (b); *see also Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) ("The FMLA makes it unlawful for an employer to interfere with an employee's attempt to exercise any FMLA rights. It also forbids an employer from retaliating against an employee who exercises FMLA rights.") (internal citations omitted).

As for Section 1981, that statute protects the right of all persons "to make and enforce contracts" regardless of race, 42 U.S.C. § 1981(a), and it authorizes claims for retaliation, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008). Retaliation occurs "when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). Individual employees can be held liable under Section 1981 if they "participated" in the retaliatory conduct. *Bray*, 681 F.3d at 896–97.

We review both FMLA and Section 1981 retaliation claims under the same framework. To succeed, Carter must demonstrate that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Carter's FMLA leave and prior lawsuit both constitute protected activity, and we assume for the purpose of this appeal that the failure to promote Carter constitutes an adverse employment action. The question, then, turns on causal connection.

Carter may establish this connection by using the familiar direct or indirect methods of proof. *Bray*, 681 F.3d at 896–97;

*Stephens,* 569 F.3d at 786–87. Carter proceeds under both, and we consider each in turn.

*1. Direct Method*

Under the direct route, Carter may provide either "smoking gun" or circumstantial evidence of retaliatory intent. Smoking gun evidence typically requires an admission of discriminatory intent. *Tank v. T-Mobile USA, Inc.,* 758 F.3d 800, 805 (7th Cir. 2014). Pieces of circumstantial evidence, on the other hand, may be combined to support an inference of discriminatory intent. This circumstantial evidence may include "(1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Hutt v. AbbVie Products LLC,* 757 F.3d 687, 691 (7th Cir. 2014).

Here, Carter does not provide smoking gun evidence of retaliatory intent; he instead relies on circumstantial evidence to support his FMLA and Section 1981 claims. But this approach is unavailing. Carter fails to allege sufficient facts to support an inference of retaliation on either claim. Accordingly, Carter's FMLA claim against CSU and his Section 1981 claim against Simyar fail under the direct route.

As to the FMLA claim against CSU, Carter argues that he completed his protected FMLA activity in close temporal proximity to the acting chair appointment, and that close

proximity raises suspicion of discriminatory intent. But the facts do not support his argument. Carter returned from FMLA leave in March and was involved in disputes related to his post-FMLA assignment through April. The acting chair appointment occurred in November, creating a temporal proximity of seven months. Although we have previously held that "when temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, suspicious timing … can sometimes raise an inference of causal connection[,]" *Coleman v. Donahoe,* 667 F.3d 835, 860 (7th Cir. 2012), we do not find a span of seven months to be suspicious.[4] *See Naficy v. Ill. Dep't of Human Servs.,* 697 F.3d 504, 513 (7th Cir. 2012) (holding a nine-month gap did "little to raise suspicion"); *Jajeh v. County of Cook,* 678 F.3d 560, 570 (7th Cir. 2012) (concluding that a five-month gap between complaint of discrimination and adverse employment action did not amount to suspicious timing); *Leonard v. E. Ill. Univ.,* 606 F.3d 428, 432 (7th Cir. 2010) (holding a six-month lag between complaint and failure-to-promote "too long to infer a link between the two").

To salvage his argument, Carter attempts to piggyback the acting chair appointment claim onto his chair appointment claim. The chair appointment occurred about one month after Carter settled the dispute regarding the exercise of his FMLA rights. The acting chair appointment occurred another six months after that. Carter in effect asks us to treat the acting chair appointment as a continuation of the chair appointment. But one is not the continuation of the other, as

---

[4] For whatever reason, Carter does not challenge an appointment that happened earlier in time than the appointment of Atha Hunt—the appointment of the first interim chair, Barbara Roper.

evidenced by the unique factual circumstances and ap-
pointment processes surrounding each. In addition, Carter's
chair appointment claim went to jury trial, and that jury de-
cided against him. If Carter were correct that the two claims
were somehow linked, any such link would be harmful, not
helpful, to his case: the jury verdict is dispositive against
him. Consequently, we reject this argument.

Regarding the Section 1981 claim, Carter also raises a
temporal argument. He claims that the temporal proximity
between his protected Section 1981 lawsuits and the failure
to appoint him acting chair supports an inference of discrim-
ination. Carter's 2007 lawsuit was still pending at the time of
the acting chair appointment, so Carter argues that a rational
juror could conclude that the timing of the failure-to-appoint
was suspicious relative to the discrimination suit.

Also relating to his Section 1981 claim, Carter argues that
a deposition statement made by Simyar provides evidence of
Simyar's animus toward Carter for having filed a prior dis-
crimination lawsuit. Specifically, Simyar was questioned
about the sanctions recommended by Assistant Vice Presi-
dent Jefferson in April 2007. Simyar was asked whether
those financial sanctions had ever actually been imposed
against Carter, or whether no further action had been taken
after Jefferson recommended them. Simyar responded that
he believed Carter had not been sanctioned, saying that "if it
would have happened, Professor Carter would write me let-
ters and file grievance[s] and complaints and so on." He had
not received any such letters or grievances, so he believed
Carter had not been sanctioned.

Carter interprets this statement as a veiled reference to
the prior discrimination lawsuit he filed (as well as his other

grievances and lawsuits over the years), laying bare Simyar's animus against Carter. Read in context, however, Carter's interpretation of Simyar's statement is not a reasonable one. Simyar's statement merely evinces a chain of logical reasoning. When asked whether Carter had been sanctioned, and without any direct evidence upon which to answer the question, Simyar reasoned that Carter must not have been sanctioned: if he had, Carter would have lodged a complaint.

Simyar went on to add that "if anybody's salary is [reduced], they will go and complain." This statement makes clear that Simyar was referring not just to Carter, but to any reasonable person facing financial sanctions. This is consistent with the behavior to be expected of any tenured professor, regardless of whether he had a history of filing discrimination complaints. Someone who is financially sanctioned is quite likely to appeal that decision up the administrative hierarchy. While we accord all reasonable inferences to Carter at the summary judgment stage, the inference of animus that he suggests here is not a reasonable one.

The remaining evidence Carter cites applies equally to the FMLA and Section 1981 claims. Carter claims that Simyar's efforts to support Coupet over Carter in the *chair* appointment provide evidence of retaliatory motives in the *acting chair* appointment. Again, Carter asks us to treat the acting chair claim as a continuation of the chair claim. We decline to do so. Drawing an inference of retaliation in the acting chair claim would require a leap in logic that we are unwilling to take.

Carter next claims that he and Hunt were similarly situated parties, and that Hunt was treated differently by being appointed acting chair. We discuss this claim in detail in the

following section, as it overlaps with Carter's arguments under the indirect method of proof.

And finally, Carter claims that Simyar's stated reasons for selecting Hunt were pretextual. When asked why he did not appoint Carter to the acting chair position, Simyar stated, "No reason. I had to appoint one person. I appointed Atha Hunt."

To show pretext, Carter must establish that Simyar's "ostensible justification for its decision is unworthy of credence." *Tank*, 758 F.3d at 807–08 (citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001)). He can do this by "providing evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the [employment action]." *Tank*, 758 F.3d at 808 (quoting *Gordon*, 246 F.3d at 888–89). While Simyar's stated reason was admittedly terse and lacking in detail, Carter presented no evidence, aside from vague references to the evidence discussed above, to show that Simyar's stated reason was "unworthy of credence."

Looking at this proffered evidence in combination, we conclude that Carter has not presented sufficient evidence to establish a genuine issue of material fact as to Simyar's and CSU's motives in not appointing Carter to the acting chair position. The lone piece of evidence that carries any weight supporting an inference of retaliatory motive is the temporal proximity between Carter's prior lawsuits and the acting chair appointment. But we have repeatedly held that "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Coleman*, 667 F.3d at

860. Without any other corroborating evidence, Carter's claim cannot survive summary judgment under the direct route.

*2. Indirect Method*

As discussed, Carter also proceeds under the indirect method of proving retaliatory intent. Under this method, Carter must first establish a *prima facie* case of retaliation. Once he has done so, the defendants must articulate a legitimate, non-discriminatory reason for the employment action. The burden then shifts back to Carter to offer evidence that the defendants' stated reason was pretextual. *Vaughn v. Vilsack,* 715 F.3d 1001, 1006 (7th Cir. 2013).

To meet his *prima facie* burden in a retaliation claim, Carter must establish that: "(1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations…; (3) he suffered a materially adverse action; and (4) he was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity." *Id.*

In the failure-to-promote context, we have described the standard with an added degree of particularity. In terms of his adverse employment action, Carter must show that he applied, was qualified, and was rejected for the position sought. *Grayson,* 317 F.3d at 748. And in order to satisfy the fourth prong, that he was treated less favorably than a similarly situated employee, he must show that "the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Id.*

Thus, when the failure-to-promote is allegedly retaliatory, the plaintiff must show the following to meet his *prima*

*facie* burden: (1) he engaged in statutorily protected activity; (2) he applied for and was qualified for the position sought; (3) he was rejected for that position; and (4) the employer granted the promotion to someone who did not engage in statutorily protected activity, and who was not better qualified than the plaintiff.[5]

We conclude that Carter did not meet his *prima facie* burden under the indirect method. The district court concluded that Carter could not satisfy the second prong—that he applied for the position sought—because he failed to express interest in being considered for the position. We need not determine whether Carter's case is defeated by the second prong, however, because we conclude that he failed to present evidence establishing that CSU and Simyar granted the promotion to someone who was not better qualified than Carter.

Carter alleges the following facts as supporting the determination that Hunt was less qualified than Carter: Hunt has a JD, not a PhD; a JD typically would not satisfy the Department's tenure requirements; and Hunt did not receive four faculty votes in the Chair appointment race, as Carter did.

These facts do not carry the day. Even accepting all of them as true, Carter does not establish a genuine dispute of material fact regarding whether Hunt was less qualified than

---

[5] The parties seem to assume, but do not explicitly state, that this is a "failure-to-promote" case. We think that is an accurate description, but regardless, how we classify the case is not dispositive, as Carter's claim would also fail if evaluated under the more general "retaliation" standard.

Carter for the position of acting chair. First, Carter does not identify any criteria used by CSU for determining acting chair appointments. Without knowing what qualifications the department sought in an acting chair, it is almost impossible to determine which candidate was more or less qualified.

Nor does Carter identify what significance, if any, CSU officials placed on degree credentials in the acting chair appointment. Carter relies on an inference that because a JD is not normally sufficient to qualify a professor for tenure, it must be viewed by CSU as an inferior degree credential for the purposes of acting chair. For several reasons, we cannot make that inference. Carter seems to concede that Hunt was in fact granted tenure—so the factors that induced CSU to grant Hunt "extraordinary" tenure may be the very factors that made him particularly qualified to serve as acting chair. Or perhaps the acting chair has frequent exposure to matters of legal significance, and a JD is a great asset. Without any information about the qualifications that CSU sought, Carter simply cannot establish that Hunt was not more qualified.

Carter also suggests that having previously received four faculty votes in the *chair* appointment process constitutes a "qualification" for the purposes of appointment to *acting chair*. This contention is without merit. The faculty chair vote represented a recommendation on behalf of the faculty that was non-binding on both the college's dean and the university president. Carter provides no evidence to support the conclusion that faculty preference could somehow be interpreted as a job qualification. Even if that recommendation could properly be classified as a qualification, there is no apt comparison to be made between Hunt and Carter. Hunt

simply was not part of that race—only Carter and Coupet submitted their names for consideration. It is true that half of the faculty, when given the choice between Carter and a person who was not Hunt, chose Carter. No inferences can be drawn, however, about the faculty's preference for Hunt, or Hunt's qualifications, from the fact that he chose not to throw his hat in the ring.

Finally, Carter did not provide any other information that would permit a finder of fact to compare him with Hunt. That includes information about how long Hunt had been employed by the university or in other teaching positions; how many and which courses Hunt taught; how Hunt was reviewed by students and superiors; his performance in any of his job responsibilities; or his level of administrative experience.

We conclude by noting that several pieces of evidence in the record before the district court support the conclusion that, at least in terms of performance, Carter may well have been *less* qualified than Hunt. Tolia stated in his deposition that the administration had received a variety of student complaints about the quality of Carter's teaching. Tolia testified that, per the department's protocol, he had attempted to resolve at least one of those student complaints by facilitating a conference between Carter and the student. Carter refused to attend the meeting.

In addition, record evidence suggests that Carter twice refused to teach one of his classes for an entire semester. Carter also conceded that he had been previously removed by the university president as chair of the department. In doing so, the president cited Carter's "overall ineffective leadership evidenced by extreme divisiveness within the de-

partment and faculty perception of inequitable standards applied to department members." Faced with these facts, and the lack of information presented by Carter, a reasonable jury simply could not have concluded that Hunt was no more qualified than Carter.

*C. Motion to Reconsider the Grant of Summary Judgment*

We need not address Carter's appeal of the denial of his motion to reconsider. The entry of summary judgment against Carter was a final order, and it completely disposed of Carter's claims. Because we affirm that grant of summary judgment, his appeal of the denial of his motion to reconsider the grant of summary judgment is dismissed.

### III. CONCLUSION

Because Carter did not raise a genuine issue of material fact regarding his employer's allegedly retaliatory motives through either the direct or indirect methods of proof, his claims cannot survive a motion for summary judgment. We therefore AFFIRM the district court's grant of summary judgment and DISMISS Carter's appeal of the denial of his motion to reconsider.

AFFIRMED