In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1347

CARLTON HART,

*Plaintiff-Appellant,*

*v.*

CHRISTINE MANNINA, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-CV-1691-WTL-DML — **William T. Lawrence**, *Judge.*

ARGUED DECEMBER 10, 2014 — DECIDED AUGUST 17, 2015

Before EASTERBROOK, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Allowing a reality television program to film an ongoing murder investigation is a recipe for trouble. It is easy to imagine a detective with a looming television deadline cutting a corner to ensure that a suspect is arrested in time for the final episode. Without an arrest, the show has no resolution to satisfy the audience.

The Indianapolis Metropolitan Police Department (IMPD) participated in this sort of reality television program called *The Shift*. The film crew followed a team of homicide detectives as they investigated a deadly home invasion in November 2008. Two victims were shot. One was killed; the other survived. Police eventually arrested plaintiff Carlton Hart, and his arrest was the centerpiece for the final episode of the program's first season. As it turned out, though, Hart was the wrong man. After he had spent nearly two years in jail awaiting trial, the charges were dismissed and Hart was released. The audience of *The Shift* was none the wiser.

Hart filed this lawsuit under 42 U.S.C. § 1983 against several detectives in their individual capacities and against the City of Indianapolis alleging a variety of constitutional violations. The core of his complaint is that he was arrested without probable cause and that the lead detective on the case made false or misleading statements in her probable cause affidavit for his arrest. The district court granted defendants' motion for partial judgment on the pleadings on two claims and, after discovery, defendants' motion for summary judgment on the remaining claims.

There are many troubling aspects of IMPD's investigation, and this case should warn police departments about having their detectives moonlight as television stars. But on this record, we must affirm. Even the troubling aspects of the investigation do not add up to evidence of a violation of Hart's constitutional rights. A reasonable trier of fact could not find that police lacked probable cause to arrest him. Nor could a reasonable jury find that the lead detective, defendant Christine Mannina, made false or misleading statements in her probable cause affidavit. Four surviving witnesses

from the home invasion separately identified Hart as one of the men who attacked them. None of the police had any reason to doubt these identifications when they arrested Hart.

I. *Factual and Procedural Background*

We review *de novo* the grant of summary judgment, examining the record in the light most favorable to the non-moving party and drawing all reasonable inferences in his favor. E.g., *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A. *The Crimes*

Plaintiff Carlton Hart was arrested and charged with murder and related crimes stemming from a deadly home invasion that took place on November 3, 2008. Five people were at the home: Richard Miller, Duane Miller, Ricky Bluiett, Tamela Daniels, and Kourtney Glasscock. Richard and Duane were brothers, Bluiett was the Millers' step-brother, Daniels was Duane's friend, and Glasscock was Bluiett's girlfriend.

According to statements from the surviving eyewitnesses, three men were involved in the home invasion. When the incident began, Glasscock and Bluiett were sitting in a car parked in the driveway. Three armed men approached the house. One man took Glasscock to the side of the house and held her captive. The other two men entered the residence with Bluiett at gunpoint. Inside the house, the two men encountered Richard in the foyer and Duane and Daniels in a back bedroom. One gunman shot Richard. He died from his

wounds that evening. The other gunman shot Duane, but he survived. Bluiett, Daniels, and Glasscock were left unharmed when the gunmen fled.

B.  *The Pre-Arrest Investigation*

Defendant Detective Christine Mannina and several other detectives conducted interviews with the four surviving eyewitnesses on November 3 and 4. During these initial interviews, all four witnesses identified the perpetrators as black men wearing dark hooded sweatshirts, but none of the witnesses knew who the men were. The investigation made little progress until November 13, 2008, when there was a breakthrough.

Bluiett contacted Detective Mannina and told her that the man who shot Richard looked like a man he had seen on the social media website MySpace.com. He identified the man as Samuel Swavely. Five days later, Duane called Mannina and told her he recognized another man from a video on the internet as the person who shot him. Duane explained that after his mother had learned that Swavely was a possible suspect in Richard's murder, she looked at Swavely's MySpace page and came across a hyperlink to a music video. She showed Duane the video, and he recognized the man who shot him (who was not the same man Bluiett had identified as the man who shot and killed Richard).

The next day, Detective Mannina visited Duane Miller and watched the video herself. Duane repeated that the man in the video was the man who shot him. Mannina took a picture of the man in the video with the hope of identifying him later.

Three days later, on November 22, 2008, Mannina formally interviewed Duane Miller, Bluiett, Glasscock, and Daniels, each for a second time. Mannina was the only police officer present with the witnesses during the November 22 interviews. All of the interviews were conducted separately; the witnesses did not discuss their interviews with one another either beforehand or afterward.

Each witness identified Hart in the photo array as one of the people involved in the home invasion. Bluiett identified Hart as the man who pointed a gun at him and who shot Duane. Glasscock identified Hart as the man who told another attacker to shoot her if she moved while she was held captive. Daniels identified Hart as the man who shot Duane. And Duane himself identified Hart as the man who shot him.

C. *Carlton Hart's Arrest*

After the four surviving witnesses identified Hart as one of the attackers, Mannina drafted a probable cause affidavit for his arrest in which she swore to the underlying facts. She met with prosecutor Denise Robinson to decide whether to move forward. Robinson and Mannina reviewed the affidavit and the accompanying case file. Robinson then met separately with Duane Miller, who confirmed that Hart was the man who shot him.

After meeting with Mannina and Duane, Robinson concluded there was sufficient evidence to arrest Hart for his involvement in the home invasion. Robinson approved Mannina's affidavit of probable cause, and the arrest warrant was sought and issued. Police arrested Hart on December 3,

2008. He was detained pending trial. Swavely was also arrested and charged, but he is not a part of this civil case.

D.  *Ricky Bluiett's December 11, 2009 Interview*

In December 2009, a year after Hart's arrest and a week before Hart's and Swavely's trial was scheduled to start, Bluiett contacted the prosecutor's office and expressed reservations about his earlier identifications of Hart and Swavely. He said he was "pretty sure but not completely sure" Hart and Swavely were involved in the home invasion. Defendant Detectives Jeff Breedlove and Kevin Kelly re-interviewed Bluiett on December 11, 2009.

The detectives asked Bluiett about his earlier identifications. At one point, they asked him whether he signed the photo array with Swavely's picture in it. Bluiett said yes, but he explained: "Like I was pretty sure, but like I said, I'm not completely sure. I can't a hundred percent say that that's the guy." He added: "I wasn't reluctant. I kind of signed, but I signed because I guess that's what I was supposed to do, you know?" The detectives asked Bluiett to explain, and he said: "I mean, I thought signing it meant that I had made like an identification. I didn't know that signing it meant yes, a hundred percent sure that that's that person. That's the man but, you know?"

Breedlove and Kelly then asked Bluiett whether he had ever told Mannina he was not completely sure of the identification. Bluiett said yes, explaining that he had told Mannina he was unsure about his identifications sometime earlier in the investigation when Mannina came to his house to follow-up on something. Critically, this conversation with

Mannina occurred *after* Hart and Swavely had already been arrested. This is how Bluiett described that conversation:

Officer:   Did you tell Detective [Mannina] that you weren't [completely sure]?

Bluiett:   I did later. Yeah. I actually did. We—she came to my house—she called me and she came to my house and she asked—she asked—we—we talked about something and I told her that I wasn't completely sure that these were the people. And we had a long conversation about it. And she was like, "This is—." She was just trying to convince me. And I told her—

Officer:   Can you tell me—can you tell me how that conversation went?

Bluiett:   She basically was—I mean—trying to convince me that it was them. And I was saying, "Well, you know, it's—it's these people's life that I have in my hands right now and I can't say I'm a hundred percent sure when I'm not a hundred percent sure." And she was just trying to convince me that it was them and it was just like—

Officer:   Well, how did she—how did she try to convince you?

Bluiett:     She just kept [inaudible] like "These
are the guys. These are the guys,"
you know? "If they don't go to jail,
they're just gonna have a chip on
their shoulder and be out here and
think they're invincible." Stuff like
that. We talked for like two hours—
two and a half hours.

App. 349–50.

Three days later, on December 14, 2009, the state court
held a hearing in Swavely's and Hart's criminal case. Swave-
ly's attorney summarized Bluiett's most recent statement to
police. The prosecutor admitted that Bluiett had told prose-
cutor Robinson that he felt he "was being pressured to be a
hundred percent" certain about his identifications when in
fact he was only "pretty sure." The court then heard testi-
mony from Bluiett, who said that although he did not feel he
was being "pressured," Mannina had come by his house and
told him he needed to "be a hundred percent sure" about his
identifications. Bluiett clarified, however, that no one had
ever suggested whom to pick out during the photo array
presentations.

After hearing Bluiett's testimony, the court asked the
prosecutor whether the State had any evidence against
Swavely or Hart apart from Bluiett's identifications. The
prosecutor told the court that there was no other evidence
against Swavely, but he assured the court that three other
witnesses had separately identified Hart. The court dis-
missed the charges against Swavely but declined to dismiss
the charges against Hart.

E.   *Hart's Release*

Hart's trial was continued several times over the following months. During the prosecution's preparation of its case, the physical evidence that had been collected at the crime scene was eventually processed. None of the physical evidence (i.e., the fingerprints, blood samples, shell casings, or DNA evidence) connected Hart to the home invasion. During this period, Hart also filed two notices of alibi and produced copies of his cell phone records showing that his phone was at his recording studio at the time of the crimes. Finally, on October 20, 2010 the State moved to dismiss the charges against Hart, citing an "insufficient nexus" between Hart and the crime. Hart had spent nearly two years in jail pending trial.

F.   *The Reality Television Program The Shift*

The investigation of the Miller home invasion was filmed by Lucky Shift, Inc. for a reality television program called *The Shift*. *The Shift* was a six-episode reality police drama that followed the work of the homicide detectives on IMPD's "middle shift," named for the detectives who worked between 2:00 and 10:30 p.m. Lucky Shift filmed IMPD's homicide investigations from July 2008 to November 2008. The final episode of Season 1, "Brother's Keeper," focused on the Miller home invasion and Hart's arrest for murder. The episode aired on January 25, 2009, about two months after Hart was arrested.

Defendants Mannina, Officer Lesia Moore, Breedlove, Kelly, and the City of Indianapolis were all paid for their participation in *The Shift*. Mannina was paid at least $14,500 for her participation, Moore at least $2,500, Breedlove at least

$2,750, and Kelly at least $3,000. The City received a contribution of $1,000 for allowing access to its detectives and facilities. The television company also paid for window tinting for the homicide detectives' squad cars and new badges for the detectives.

G. *The Civil Lawsuit*

After the criminal charges were dismissed, Hart filed suit under 42 U.S.C. § 1983 bringing claims under the Fourth, Sixth, and Fourteenth Amendments against Mannina and several other detectives in their individual capacities and against the City of Indianapolis. The district court granted defendants' motion for partial judgment on the pleadings on Hart's federal claims for malicious prosecution and abuse of process under the Fourth and Fourteenth Amendments. Relying on *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001), the district court held that these claims failed as a matter of law because Indiana tort remedies "knock out" federal claims for malicious prosecution and abuse of process. In an opinion issued after the district court's decision, however, we clarified that Indiana law does not bar these federal claims because Indiana grants absolute immunity to state and local officers on such state-law claims, rendering the state tort remedies inadequate. See *Julian v. Hanna*, 732 F.3d 842, 846–47 (7th Cir. 2013).

The district court later granted summary judgment to all defendants on the remaining claims. *Hart v. Mannina*, 992 F. Supp. 2d 896 (S.D. Ind. 2014). Count I asserted a claim for making false or misleading statements in support of a probable cause affidavit in violation of the Fourth and Fourteenth Amendments. Count II asserted a claim for false arrest and false imprisonment in violation of the Fourth and Fourteenth

Amendments. Count V asserted a claim for the denial of
Hart's speedy trial right under the Sixth and Fourteenth
Amendments. Hart appeals as to all counts.

II. *The Fourth Amendment Claims*

We begin with Hart's claims for false arrest, false impris-
onment, and malicious prosecution. If there was probable
cause to arrest, then all of these claims fail as a matter of law.
See *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)
("Probable cause to arrest is an absolute defense to any claim
under Section 1983 against police officers for wrongful ar-
rest, false imprisonment, or malicious prosecution."). The
central issue in this appeal is whether police had probable
cause to arrest Hart. The undisputed facts show that they
did because four witnesses identified him as one of the
shooters. Hart's efforts to undermine those identifications or
otherwise to avoid their decisive effect are not supported by
evidence.

A. *Probable Cause to Arrest*

Police officers have probable cause to arrest when the to-
tality of the facts and circumstances within their knowledge
at the time of the arrest would warrant a reasonable person
in believing the person has committed a crime. E.g., *Abbott v.
Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). Probable
cause does not require certainty. It is a "fluid concept that
relies on the common-sense judgment of the officers based
on the totality of the circumstances." *United States v. Reed*,
443 F.3d 600, 603 (7th Cir. 2006). In deciding this question on
a motion for summary judgment, "we must give the non-
moving party the benefit of conflicts in the evidence about

what the officers actually knew at the time." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013).

Probable cause can be based on a single identification from a credible eyewitness. E.g., *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). In this case, there were four. Bluiett, Glasscock, Daniels, and Duane Miller each identified Hart in a photo array as one of the men who carried out the deadly home invasion. Each witness made the identification in a separate interview with Detective Mannina on November 22, 2008. There is no evidence that (1) any of the witnesses discussed their identifications with the other witnesses before or after their own identifications; (2) Mannina or any other police officer signaled to witnesses whom to identify in the photo array; (3) Mannina used an unduly suggestive photo array; or (4) any of the officers knew or should have known that the eyewitnesses were mistaken or lying.

Hart contends that a reasonable jury could find that Mannina coached the witnesses to identify Hart. If she had done so, their identifications would not have provided her with probable cause. To supply probable cause, witness identifications cannot be the product of coercion or manipulation. Cf. *Phillips v. Allen*, 668 F.3d 912, 917 (7th Cir. 2012) ("An officer who employs the forbidden technique in order to manufacture an identification can't complain when a court provides a remedy."). But Hart has no evidence of coaching. Mannina denied that she coached any of the witnesses, and all four witnesses testified that they were neither coached nor otherwise led to identify Hart in the photo array. Hart has not produced any evidence casting doubt on this evidence. Instead, he relies on speculation, which is "insuffi-

cient to withstand summary judgment." *Morfin v. City of East Chicago*, 349 F.3d 989, 1002 (7th Cir. 2003).

Hart attempts to create a genuine issue of material fact with evidence that Mannina failed to record the beginning of each of the November 22 interviews. Before she turned on the tape recorder to record the ensuing identifications, Mannina presented the photo array to each witness and asked if the witness recognized anyone. Each witness said yes. Only then did Mannina turn on the tape recorder.

Mannina's interview procedure was flawed. Turning on the tape recorder only after the witnesses said they recognized someone in the photo array presents an incomplete picture of the witnesses' interaction with the police. See U.S. Department of Justice, Technical Working Group for Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement* 23–24 (October 1999); International Ass'n for Chiefs of Police, *Model Policy on Eyewitness Identification* 2 (September 2010). Recording the entire interview preserves the integrity of the evidence and minimizes the risk that erroneous (or coerced) eyewitness identifications go undetected. Mannina's procedure failed to do either. But such criticism of police methods does not by itself establish a constitutional violation. On this record, there is simply no evidence of coercion or manipulation, and no evidence that any witness said anything helpful to Hart in the unrecorded moments of those interviews.[1]

---

[1] Another problem with Mannina's interview technique is that it could have led to the loss of *Brady* material. Whether recorded or not, any time a witness is presented with a photo array, is asked to identify a suspect, and then fails to identify the suspect, if anyone in the photo array is later prosecuted, he will be entitled under *Brady v. Maryland*, 373

Hart argues in the alternative that we should reverse summary judgment on his claims as a sanction for what he calls IMPD's "spoliation" of evidence. Lucky Shift videotaped the entirety of each November 22 interview, including the part of the interviews that Detective Mannina failed to record. This raw video footage was destroyed in March 2009, a little more than a month after the final episode aired. Hart argues that IMPD had a duty to preserve this evidence and that a reasonable jury could find that it was responsible for its destruction. We disagree with Hart on both points.

A police officer's duty to preserve evidence applies when the officer either knows the evidence is exculpatory or destroys the evidence in bad faith. See *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (destruction of potentially exculpatory evidence is denial of due process only when done in bad faith); *California v. Trombetta*, 467 U.S. 479, 488–89 (1984)

---

U.S. 83 (1963), to know about the non-identification. Mannina's interview technique failed to preserve such evidence.

A further problem is that this procedure avoided the preferred "double-blind" method of administering identification procedures, in which the administering officer does not know who is and is not a suspect. Without the double-blind procedure, there is an avoidable risk that the administering officer will inadvertently provide cues to the witness before, during, or after the viewing. See, e.g., *State v. Lawson*, 291 P.3d 673, 686, 705–06 (Or. 2012); *State v. Henderson*, 27 A.3d 872, 896–97 (N.J. 2011); International Ass'n of Chiefs of Police, *Model Policy on Eyewitness Identification*, at 1–2 (2006); Amy Klobuchar et al., *Improving Eyewitness Identification: Hennepin County's Blind Sequential Lineup Pilot Project*, 4 Cardozo Pub. L. Policy & Ethics J. 381 (2006); State of Wisconsin, Office of the Attorney General, *Model Policy and Procedure for Eyewitness Identification* (2009); Gary L. Wells, et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 Law & Hum. Behav. 603 (1998).

(good-faith failure to preserve evidence with no apparent exculpatory value did not violate due process). Because the record establishes beyond reasonable dispute that the initial moments of each interview merely involved the witness telling Mannina that he or she recognized someone in the photo array, there is no evidence that Lucky Shift's raw footage was exculpatory to Hart. Cf. *Armstrong v. Daily*, 786 F.3d 529, 547 (7th Cir. 2015) (plaintiff plausibly alleged that potential exculpatory value of drug paraphernalia used the night of victim's murder in her home was apparent to investigators and that loss or destruction was in bad faith or at least reckless).

Nor is there evidence that the raw video footage was destroyed in bad faith. Hart makes much of the fact that Lucky Shift destroyed the footage three days after co-defendant Swavely's attorney filed a discovery motion in the criminal case seeking "all contracts and/or agreements between the Indianapolis Metropolitan Police Department and/or the City of Indianapolis and Investigation Discovery/Discovery Channel/Discovery Communications, Inc. relating to the recording and production of the television program 'The Shift.'" Even if Swavely's discovery request for "contracts and/or agreements" could be extended to cover the raw footage itself, which would be a stretch, there is no evidence connecting the filing of that discovery motion to Lucky Shift's decision to destroy the videotapes.

Lucky Shift's president testified that the company typically sent its raw footage to an independent shredding company roughly thirty days after the episode aired. She explained that the company followed that process here, sending the footage to be destroyed approximately thirty-nine days after the episode aired. Hart has offered no evidence casting

doubt on this explanation. Nor is there evidence that Mannina or anyone else at IMPD knew of Swavely's request or communicated with Lucky Shift about the footage or participated in its destruction.

Hart's final argument on this claim is that a reasonable trier of fact could infer that Mannina coached or otherwise led the four eyewitnesses to identify Hart based on evidence that Mannina pressured a fifth person, Adrian Rockett, to implicate Hart in the Miller home invasion three months after Hart's arrest and also pressured Bluiett to maintain his identification of Hart when they spoke at Bluiett's house, again well after Hart's arrest.

In March 2009, Detectives Mannina and Lesia Moore interviewed Adrian Rockett, a suspect in another case, who told police that he had information about the Miller shootings. Detective Jeff Breedlove was initially scheduled to interview Rockett, but he was called away for something and told Moore and Mannina to interview him. Breedlove watched the interview live on a direct feed to his computer.

During the interview, Mannina presented a photo array to Rockett. He identified Hart as involved in the Miller home invasion. Mannina's interview technique bothered Breedlove. He approached Mannina after the interview and expressed his concern that her technique had been unduly suggestive. He noted that Rockett seemed "a little wishy-washy" in his identification and that it looked as if Mannina had encouraged Rockett to sign the photo array after he initially hesitated. Breedlove did not believe Mannina had given Rockett any indication about whom to pick out in the photo array, but he thought she crossed a line when she encouraged him to sign the photo array.

We recognize the possibility that circumstantial evidence concerning a later interview may be so compelling as to permit a reasonable inference that the police used an improper technique during an earlier interview. But that is not this case. There is no evidence that Mannina actually suggested to Rockett that he should select Hart from the photo array. Breedlove criticized Mannina's technique, but he also testified—and there is no evidence to the contrary—that Mannina did not signal to Rockett whom to identify in the photo array. From this evidence, a jury could not reasonably infer that Mannina had improperly coached other witnesses four months earlier, all of whom deny they were coached.

The same is true about the conversation Bluiett and Mannina had when she came by Bluiett's house. (This was the conversation recounted during Bluiett's December 11, 2009 interview with Detectives Breedlove and Kelly.) If this conversation had occurred before Hart had been arrested, this would be a different case at summary judgment because it would provide at least some evidence that Mannina pressured one of the eyewitnesses to maintain an otherwise shaky identification. But here the conversation occurred well after Hart had been arrested, and Bluiett did not ever say he had been pressured *before* Hart's arrest. Again, he denied being tipped off, coerced, or otherwise manipulated during the crucial photo array presentation that laid the foundation for the probable cause determination.

Even viewing the record in the light most favorable to Hart, a reasonable jury could not find that police lacked probable cause to arrest him. Because probable cause is a complete defense to false arrest, false imprisonment, and

malicious prosecution, defendants were entitled to summary judgment on those claims.

B.  *The Probable Cause Affidavit*

We next turn to Hart's claim that Detective Mannina made false or misleading statements in her probable cause affidavit for his arrest. The probable cause affidavit relied on the four November 22, 2008 identifications to establish probable cause. As we have explained, these four identifications, if taken at face value, were more than sufficient to establish probable cause. But Hart argues that the identifications should not be taken at face value because the affidavit was false and misleading in two respects: (1) Mannina knew or should have known that the eyewitness identifications were unreliable, and (2) Mannina omitted exculpatory information that would, if included, have led the judge to deny her request for an arrest warrant.

A "warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003); see also, e.g., *Olson v. Champaign County*, 784 F.3d 1093, 1100 (7th Cir. 2015) (police not entitled to qualified immunity for providing false information in probable cause affidavit for arrest). A "'reckless disregard for the truth' can be shown by demonstrating that the officer 'entertained serious doubts as to the truth' of the statements, had 'obvious reasons to doubt their accuracy,' or failed to disclose facts that he or she 'knew would negate probable cause.'" *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir.

2012), quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003).

We agree with the district court that no reasonable trier of fact could find on this record that Mannina's probable cause affidavit was false or misleading. There is no evidence that she knew or should have known that the November 22 identifications were unreliable. Hart relies on two facts: (1) all four witnesses said in their initial statements to police on November 3 and 4 that they did not see the attackers' faces clearly, and (2) one of the witnesses (Glasscock) expressed uncertainty about whether she would be able to identify anyone involved in the crime. Neither fact makes the witnesses' later identifications of a photograph so unreliable that the police could not rely on them to seek an arrest warrant.

A police officer is permitted to rely on information provided by an eyewitness as long as the officer reasonably believes the witness is telling the truth. See *Matthews v. City of East St. Louis*, 675 F.3d 703, 706 (7th Cir. 2012); *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (7th Cir. 2001); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998). In real-world investigations, police often confront the limits of human memory and facial recognition. A witness who initially expresses doubt about being able to identify a suspect but then later tells police she recognizes a familiar face need not be considered mistaken or dishonest. Nor do minor inconsistencies among witnesses' statements necessarily imply that they are mistaken or dishonest. See *Askew v. City of Chicago*, 440 F.3d 894, 896–97 (7th Cir. 2006) (minor inconsistencies across eyewitness statements are "normal" and "do not disentitle police to rely on eyewitness statements"). The

question under the Fourth Amendment is whether the of-
ficer reasonably believed the witness was telling the truth.

Here, nothing in the witnesses' first statements would
have made it unreasonable for police to rely on their later
identifications of a photograph of a suspect. Each witness
had close contact with the attackers and had an opportunity
to view the man each later identified as Hart. In their first
statements to the police, all of the witnesses provided specif-
ic descriptions of that man. The descriptions included details
about what the man was wearing and his apparent age, race,
height, and build. To be sure, the witnesses did not have a
perfect view of Duane's shooter because he was wearing a
hooded sweatshirt pulled up over his head. But nothing else
obscured his face. All four witnesses told police in their first
statements that the gunman wore glasses or sunglasses.

Not surprisingly, there are some minor differences
among these initial descriptions. For example, Glasscock
said the man was in his late twenties to early thirties while
Bluiett said he was between eighteen and twenty-five years
old. But none of these discrepancies detract from the fact
that all four descriptions are largely consistent with one an-
other and with Hart's actual appearance. The witnesses' en-
counters with the attackers were brief and stressful, but no
evidence suggests that they could not offer reliable identifi-
cations. Cf. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (rel-
evant factors for determining reliability of eyewitness identi-
fication include the witness's opportunity to view the crimi-
nal at time of crime and the accuracy of his prior description
of the criminal); *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)
(same); see also *Perry v. New Hampshire*, 565 U.S. —, 132 S. Ct.
716, 721 (2012) ("When no improper law enforcement activi-

ty is involved, … it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proven beyond a reasonable doubt."). Nothing about the witnesses' first statements to police made later identifications of Hart's photograph so untrustworthy that police could not rely on them to seek Hart's arrest.

Hart also argues that Mannina should have known that the November 22 identifications were unreliable because there was evidence that the MySpace video was circulating among members of the Miller family. According to Hart, this evidence should have alerted Mannina to the possibility that the four witnesses were colluding to identify Hart—that they had been exposed to the MySpace video and knew Hart was a suspect in the crime before they were presented with the photo array.

This is plausible in theory, but the record does not support it. Although there is evidence that the video circulated within the Miller family, there is no evidence of collusion among the witnesses, only two of whom were actually members of the Miller family. Duane Miller of course saw the MySpace video before he saw the photo array, but there is no evidence that he told the other witnesses of the video's existence. To the contrary, he told Mannina during his November 22 interview that he never showed the MySpace video to Bluiett, Glasscock, or Daniels. Bluiett, Glasscock, and Daniels all testified that they had never seen the MySpace

video before identifying Hart in the photo array on November 22. Hart cannot rebut that testimony with speculation.

Hart also argues that Mannina omitted material exculpatory information from the probable cause affidavit. "The materiality of an omitted … fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010). If the omitted fact would not have negated probable cause, its omission was immaterial and there was no Fourth Amendment violation. See *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978); accord, *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984) (applying *Franks* to omissions). To assess materiality, "we examine whether a hypothetical affidavit that included the omitted material would still establish probable cause." *United States v. Robinson*, 546 F.3d 884, 888 (7th Cir. 2008).

Hart identifies two sets of omissions. First, he lists a slew of facts about the witnesses' *initial* descriptions from November 3 and 4 that were not included in the probable cause affidavit—for example, it was dark during the incident and the witnesses had only a limited time to view Duane's shooter. None of these facts, if included, would have negated the probable cause determination, which was based on the witnesses' November 22 identifications of Hart's photograph, not their initial descriptions.

The second set of omissions relate to the later identifications. Detective Mannina did not disclose that she failed to record the first part of each of the November 22 interviews. She also failed to disclose that Bluiett told her he was only "pretty sure" that Hart was the person who was involved in

the home invasion. Neither of these omitted facts would have negated probable cause if they had been included.

As noted above, there is no evidence that any of the witnesses said anything to Mannina during the unrecorded part of each interview that would have exculpated Hart or undermined the credibility of the witnesses or their identifications of Hart. The record establishes beyond reasonable dispute that during the unrecorded parts of the interviews, the witnesses merely confirmed that they recognized someone in the photo array. Adding to the affidavit the fact that Mannina had failed to record her initial exchanges with each witness would not have negated probable cause.

The same is true for Mannina's failure to include Bluiett's "pretty sure" qualification. Although we believe she should have included this qualification in the affidavit, in the end its omission was not material. Three other witnesses identified Hart, and none of them expressed such uncertainty. Adding Bluiett's qualification would not have negated probable cause. See *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("Applying this standard, we have consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause.").

In sum, the summary judgment record would not permit a reasonable trier of fact to find that Mannina made false or misleading statements that were necessary to the probable cause determination. Defendants were entitled to summary judgment on Count I.

C.  *Abuse of Process*

Hart also asserts what he calls a constitutional claim for abuse of process. He assumes, without explaining, that this claim is cognizable under § 1983, citing both the Fourth and Fourteenth Amendments. The only authority he cites for this proposition is *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), which dealt only with a malicious prosecution claim.

Assuming abuse of process is cognizable under § 1983, we would look to state law to determine the elements of the claim, as we do with malicious prosecution claims. Cf. *Washington v. Summerville*, 127 F.3d 552, 558–59 (7th Cir. 1997). In Indiana, the elements of abuse of process are "(1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Lindsay v. Jenkins*, 574 N.E.2d 324, 326 (Ind. App. 1991); see also *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 464 (7th Cir. 2009) (Indiana law). We have questions about the constitutional foundation for Hart's claim, though.

Abuse of process, unlike malicious prosecution, typically focuses on the actions of those prosecuting the case *after* legal process has been initiated (i.e., after probable cause has been established). See *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 963 (7th Cir. 2010) (explaining difference between malicious prosecution and abuse of process); see also Dan B. Dobbs et al., *The Law of Torts* § 594 (2d ed. 2015) ("[T]he abuse of process claim permits the plaintiff to recover without showing the traditional want of probable cause for the original suit and without showing termination of that suit."); Restatement (Second) of Torts § 682, cmt. a (1977) ("The gravamen of the misconduct … is not the wrongful procurement of legal process or the wrong-

ful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish.").

It is not clear to us that abuse of process is cognizable as a Fourth Amendment claim. Abuse of process is an awkward fit for the Fourth Amendment for two reasons. First, the protections of the Fourth Amendment drop out of the picture after the detainee has received legal process, typically an arraignment. See *Llovet v. City of Chicago*, 761 F.3d 759, 763 (7th Cir. 2014) ("*Heck* [*v. Humphrey*, 512 U.S. 477, 484 (1994)] and *Wallace* [*v. Kato*, 549 U.S. 384, 389 (2007)] imply that once detention by reason of arrest turns into detention by reason of arraignment—once police action gives way to legal process—the Fourth Amendment falls out of the picture and the detainee's claim that the detention is improper becomes a claim of malicious prosecution violative of due process."). We also question whether Hart has sued the right defendants on this theory. After he was arraigned, it was the prosecutors, not the police officers, who controlled the prosecution and decided to press forward, and prosecutors are entitled to absolute civil immunity for such decisions. See generally *Kalina v. Fletcher*, 522 U.S. 118, 125 (1997).

Second, we do not normally scrutinize the subjective motivations of law enforcement officials under the Fourth Amendment. Cf. *Brigham City v. Stuart*, 547 U.S. 398, 404–05 (2006) (reasonableness of warrantless entry into home under exigent circumstances exception does not depend on actual motivations of the officers involved); *Whren v. United States*, 517 U.S. 806, 812–13 (1996) (reasonableness of traffic stops does not depend on actual motivations of the officers involved); *Scherr v. City of Chicago*, 757 F.3d 593, 597 (7th Cir.

2014) (no violation of Fourth Amendment where search or seizure is supported by probable cause, even if police acted for improper reasons). Yet that is what we would have to do to determine whether any of the defendants had an "ulterior purpose" in participating in the criminal case against Hart.[2]

Hart's other potential constitutional basis for his federal abuse of process claim is the Due Process Clause of the Fourteenth Amendment. That theory is closer to the theory recognized in *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), and appears to be embraced by several other circuits. See *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1155 n.5 (10th Cir. 2001) (recognizing claim for abuse of process under § 1983); *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (same); *Rose v. Bartle*, 871 F.2d 331, 350 & n.17 (3d Cir. 1989) (same). But Hart's allegations in this case are substantively identical to those supporting his claims for false arrest and malicious prosecution. The only willful act identified in the complaint is the detectives' "making false, misleading, or in-

---

[2] There is language in *Smart v. Board of Trustees of the University of Illinois*, 34 F.3d 432, 434 (7th Cir. 1994), decided before *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), and *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), suggesting that a claim for abuse of process could be cognizable under the Fourth Amendment: "If malicious prosecution or abuse of process is committed by state actors and results in the arrest or other seizure of the defendant, there is an infringement of liberty, but we now know that the defendant's only constitutional remedy is under the Fourth Amendment (as made applicable to the states by the Fourteenth), and not under the due process clause directly." 34 F.3d at 434. But the underlying claim in *Smart* was based on the First Amendment, and the opinion did not grapple with the problems we have identified in recognizing the claim under the Fourth Amendment. *Smart* did not establish that a claim for abuse of process is cognizable under the Fourth Amendment.

complete statements to judicial officers and suppressing evidence." On appeal, Hart does not address this allegation and fails to designate any evidence supporting it. He relies instead on the arguments we have already rejected about the existence of probable cause and the adequacy of the probable cause affidavit.

In any event then, and assuming for purposes of argument that a claim for abuse of process might be cognizable under § 1983—either under the Fourth Amendment as applied to the states under the Fourteenth Amendment or directly under the Due Process Clause of the Fourteenth Amendment—Hart has failed to present a genuine issue of material fact on this claim. Defendants were entitled to summary judgment on Count IV.[3]

---

[3] There was a harmless error in the disposition of Counts III and IV. The district court dismissed these counts on the pleadings. The reason it gave turned out to be incorrect in light of our later decision in *Julian v. Hanna*, 732 F.3d 842, 846–47 (7th Cir. 2013) (federal claims based on wrongful arrest and malicious prosecution survived because Indiana tort remedies are inadequate). But Hart had a full opportunity to develop the record on the existence of probable cause. See *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 479–80 (7th Cir. 2002) (where non-moving party had "full opportunity to bring all material factual disputes to the court's attention," court reviewed Rule 12(b)(6) dismissal under the standard for summary judgment); see also, e.g., *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992) ("A failure of this type is harmless if the nonmoving party had an adequate opportunity to respond to the motion and material facts were neither disputed nor missing from the record.").

III. *The Sixth Amendment Claim*

We now turn to Hart's claim that the nearly two-year delay between his arrest and the dismissal of the charges violated his right to a speedy trial under the Sixth Amendment. We doubt that any of the defendant police officers could be proper defendants for such a claim, but that issue has not been presented. The district court held that Hart's claim failed for two reasons: (1) Hart's right to a speedy trial was not violated, and (2) even if there was a violation, Hart could not win money damages under § 1983 because dismissal of the charges would be the only proper remedy. We agree on the first point and do not address the second.[4]

The Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." The speedy trial right attaches when a defendant is "indicted, arrested, or otherwise officially accused." *United States v. MacDonald*, 456 U.S. 1, 6 (1982), citing *United States v. Marion*, 404 U.S. 307, 313 (1971). Hart's speedy trial right attached when he was arrested on December 3, 2008. The charges were dismissed on October 20, 2010. This nearly two-year delay is long enough to trigger analysis under the four-factor framework of *Barker v. Wingo*, 407 U.S. 514, 530 (1972). See *United States v. Arceo*, 535 F.3d 679, 684 (7th Cir. 2008) (a delay approaching one year is presumptive-

---

[4] In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court said that dismissal of the charges was the "only possible remedy," but it said this in a direct criminal appeal where the prosecutor had argued that less drastic remedies such as applying the exclusionary rule to certain evidence or granting a new trial would be more appropriate than outright dismissal. See *id.* at 522–23. The Court had no occasion to consider whether damages are available in a civil case under § 1983.

ly prejudicial); *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007) (same).

Under the *Barker* framework, whether a defendant's right to a speedy trial has been violated depends on four factors: (1) the length of the delay, (2) the reasons for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) any prejudice the defendant suffered by the delay. *Barker*, 407 U.S. at 530; see also *Doggett v. United States*, 505 U.S. 647, 651 (1992).

Even construing the record in the light most favorable to Hart, the second and third factors weigh decisively against him. Hart moved for five separate continuances and joined in two other motions filed by the prosecution, and he never asserted his right to a speedy trial. Hart counters that these continuances should not count against him because they were caused by the prosecution's misconduct during discovery. In his reply brief, for example, he claims that the continuances were necessary because IMPD "destroyed, concealed, and manufactured" evidence, putting him in the impossible position of demanding a speedy trial and risking that IMPD's "misconduct" would result in a wrongful conviction. But this conclusory assertion and others like it throughout his briefing do not persuade us. Hart fails to identify specific instances of discovery misconduct supported by competent evidence. Defendants were entitled to summary judgment on Count V.

## IV. *The Supervisory Liability and Monell Claims*

Because the district court properly dismissed Hart's claims against Detective Mannina and the other police officers who participated directly in the investigation leading to

Hart's arrest, Hart's claims against several supervisory defendants and against the City of Indianapolis also fail. See *Los Angeles v. Heller*, 475 U.S. 796 (1986); *Matthews v. City of East St. Louis*, 675 F.3d 703, 708–09 (7th Cir. 2012); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).

V.  *Hart's Motion to Compel Discovery*

Finally, Hart challenges a discovery ruling by the district court. On October 2, 2012 Hart sent a letter to defendants identifying various categories of discovery responses he found inadequate. Defense counsel promised to respond to the letter by November 30, 2012 but failed to do so. Then, in June 2013, defense counsel orally told Hart's counsel that there were no deficiencies in defendants' discovery responses and promised to draft a formal, written response to the letter. When the formal response was not forthcoming, Hart moved for an order compelling the defendants "to produce documents and provide information as requested in [his] October 2, 2012 discovery dispute letter." The district court denied the motion.

We review that ruling for an abuse of discretion. E.g., *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 646 (7th Cir. 2001). We will not reverse the district court's ruling "absent a clear showing that the denial of discovery resulted in actual and substantial prejudice" to Hart. *Id.*

We find no abuse of discretion here. In a thorough written order, the district court explained that Hart's motion focused on the failure by defense counsel to respond to the October 2012 deficiency letter in writing but did not explain adequately the substance of the parties' continuing discovery dispute. By the time Hart actually filed the motion in July

2013 (seven months after the letter was sent), defendants had diligently provided discovery and answered Hart's numerous written discovery requests. The court also found that Hart had failed to specify the discovery items that were still outstanding at the time the motion was filed. Hart has demonstrated neither an abuse of discretion nor actual and substantial prejudice.

The judgment of the district court is AFFIRMED.